Filed 7/1/13  P. v. Rivas CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ALLEN RIVAS et al.,<br><br>    Defendants and Appellants, | F061170<br><br>(Super. Ct. Nos. BF129529B & BF129529C) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOE CORONADO, JR.,<br><br>    Defendant and Appellant. | F062077<br><br>(Super. Ct. No. BF129529A)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  John R. Brownlee, Judge.

James F. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant Allen Rivas.

Richard M. Doctoroff, under appointment by the Court of Appeal, for Defendant and Appellant Hilario Torres.


**SEE CONCURRING AND DISSENTING OPINION**

Christine Vento, under appointment by the Court of Appeal, for Defendant and Appellant Joe Coronado, Jr.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Peter W. Thompson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

On October 28, 2009, a consolidated information was filed in Kern County Superior Court, charging defendants Allen Rivas, Hilario Torres, and Joe Coronado, Jr., with attempted premeditated murder (Pen. Code,[1] §§ 187, subd. (a), 189, 664; count 1), assault with a firearm (§ 245, subd. (a)(2); count 2), being a felon in possession of a firearm (former § 12021, subd. (a)(1); count 3), and active participation in a criminal street gang (§ 186.22, subd. (a); count 5). Coronado was also charged with being a felon in possession of ammunition (former § 12316, subd. (b)(1); count 4).[2] As to count 1, it was alleged Coronado personally and intentionally discharged a firearm, proximately causing great bodily injury or death (§ 12022.53, subd. (d)), and, as to Rivas and Torres, that a principal in the commission of the offense so acted (*id*., subds. (d) & (e)(1)). As to count 2, Coronado was alleged to have personally inflicted great bodily injury (§ 12022.7). It was further alleged, as to counts 1 through 4, that defendant(s) charged therein committed the crime for the benefit of or in association with a criminal street

---

[1] All statutory references are to the Penal Code, unless noted otherwise.

[2] Former sections 12021, subdivision (a)(1) and 12316, subdivision (b)(1) were repealed as of January 1, 2012, and their provisions reenacted without substantive change as sections 29800, subdivision (a)(1) and 30305, subdivision (a), respectively. (Stats. 2010, ch. 711, §§ 4 & 6; see *People v. Correa* (2012) 54 Cal.4th 331, 334, fn. 1.) Because defendants were convicted under the repealed statutes, we refer to former sections 12021 and 12316 throughout this opinion for clarity and convenience. For brevity, we also omit the word "former."

gang (§ 186.22, subd. (b)(1)). Last, it was alleged Rivas and Torres each had previously been convicted of a serious felony (§ 667, subd. (a)) that was also a strike (§§ 667, subds. (c)-(j), 1170.12, subds. (a)-(e)).

Following a jury trial, Rivas and Torres were convicted of count 3, felon in possession, and acquitted of the remaining charges. Count 3's gang enhancement allegations were found not true as to both men. Coronado was convicted of counts 1 through 4, but acquitted of count 5. The jury found true all but the gang enhancement allegations, which it found not true. Following a bifurcated court trial, Rivas and Torres were each found to have suffered a prior conviction under the "Three Strikes" law.[3]

Rivas and Torres requested that the court dismiss their prior strike convictions. The requests were denied, and each was sentenced to six years in prison and ordered to pay various fees, fines, and assessments. Coronado was sentenced to a total unstayed term of life plus 25 years to life in prison, and was ordered to pay restitution along with various fees, fines, and assessments.

Defendants now appeal, raising numerous claims of error.[4] Coronado contends that: (1) the trial court erred in denying his *Batson/Wheeler*[5] motion; (2) the trial court erred in instructing on the kill zone theory; (3) the kill zone theory instruction was ambiguous and misleading; (4) the prosecutor committed misconduct in vouching for his case; (5) the trial court erred when it denied Coronado's request to sever and bifurcate

---

[3]     The prosecutor did not proceed on the section 667, subdivision (a) allegations, as the jury's verdicts rendered them inapplicable to both Rivas and Torres.

[4]     Because Coronado was sentenced several months later than Rivas and Torres, his appeal originally was separate from theirs. By order of January 11, 2013, we consolidated the two cases.

[5]     *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*). *Wheeler* has been overruled in part by *Johnson v. California* (2005) 545 U.S. 162.

gang issues; (6) the trial court erred in denying Coronado's *Pitchess*[6] motion; (7) counsel was ineffective for failing to adequately argue to bifurcate the gang issue; and (8) cumulative error occurred. We find no merit in Coronado's contentions and affirm.

Torres and Rivas make various contentions on appeal. Because we agree that there is insufficient evidence to sustain either of their convictions for possession of a firearm, we reverse their convictions, rendering their remaining contentions moot.

**FACTS**

A.   PROSECUTION EVIDENCE

*The Shooting*

On the afternoon and evening of September 26, 2009, Johnny Elizalde threw a birthday party at his Bakersfield home for himself and his niece. Defendants were among the 30 to 60 friends and family members who attended. Elizalde had known Coronado, who lived down the street, for years, and defendants were present at Elizalde's invitation.[7] Most of those at the party congregated in the vicinity of the backyard patio, where Elizalde had music, drinks, and food.

Although Elizalde had not been involved for some 20 years, he grew up in the Colonia, a southern gang. He was familiar with the Okie Bakers; they were a south side gang who "used to kick with the Colonia." Elizalde was aware there was rivalry between southern and northern Hispanic gangs. Bakersfield was southern territory; southern gangs associated with the number 13.

Elizalde's wife, Claudia, and her family, including her brothers Ricardo, René, Johnny, and Alejandro Serrano, were from Delano.[8] Elizalde was aware that Delano was

---

[6]    *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

[7]    Elizalde knew defendants by their nicknames: "Clover" for Coronado, "Scooby" for Rivas, and "Cruiser" for Torres.

[8]    For the sake of clarity, we will refer to Claudia and members of the Serrano family by their first names. No disrespect is intended.

4.

northern territory.  He had never seen Claudia, Ricardo, or René be involved with gang-related activities.  When Elizalde gave parties, however, they would often throw signs, like a one and a four, with their hands.[9]  They were just "messing around."  Claudia playfully did so on this occasion.

The night of the party, Elizalde was wearing a Raiders jersey, Ricardo was wearing a 49ers shirt, and Coronado was wearing a Pittsburgh Steelers jersey.  The party was not a gang party; according to Elizalde, "[e]verybody uses Niners" without it making them "14."[10]  Elizalde even danced with Torres, who was wearing a white tank top with a blue rag around his neck.  Rivas was wearing a gray polo or T-shirt.  None of the defendants said anything to Elizalde about gangs or about Elizalde's family being from Delano.  In fact, prior to the discussion between Rivas and Ricardo that preceded the shooting, nobody at the party heard anyone say anything gang related.  Nobody saw anyone with a weapon prior to the shooting.

At some point during the party, Elizalde's family was singing and dancing in the backyard.  When the music stopped, Ricardo and his wife, Yolanda, started to return to the area in which they had been sitting.  As they did so, Rivas came up to Ricardo, tapped him on the shoulder, asked if he could talk to him, and pointed toward the garage. Ricardo and Yolanda walked to the garage to see what he wanted.  Yolanda felt something was not right.  She had "sensed something weird" when defendants arrived at the party, because Torres was wearing a "wife beater" shirt with a bandana over his neck, and when she saw people like that, she thought of gangs right away.  Also, at times she caught the three "just staring over" at her group, which included René.

Once inside the garage, Rivas asked Ricardo why Ricardo was throwing gang signs.  Ricardo asked what Rivas was talking about, said he was there with his family

---

**9**    Northern gangs associate with the number 14.

**10**   The color red is associated with Nortenos.

having a good time, and asked what Rivas wanted to do. Ricardo, who said he had not thrown any gang signs, interpreted Rivas's question as a challenge to fight. During the conversation, Yolanda realized Torres and Coronado were standing an inch or two from her, looking upset. This made her uncomfortable because of what Torres was wearing and the fact one had approached Ricardo and then all three got together.

Yolanda yelled at Rivas that if he had anything he wanted done or any trouble, he needed to leave, because it was her sister-in-law's house and they did not go over there to cause problems like that. Rivas then said, "let's take it outside," and started walking out of the garage to the street. When Yolanda turned to Coronado and Torres, they put up their hands. Torres told her, "no, no, no, it's cool," and Coronado said nothing was going to happen. At that point, the lights went off in the garage. Yolanda saw Coronado and Torres walk out behind Rivas. She held onto Ricardo so he would not follow them.

Later, around 10:00 p.m., René was dancing when somebody came and said his brother was getting into an argument in the front. René walked through the garage.[11] René's son, Daniel, walked close to where Rivas was standing, because he thought Ricardo was going to need help. Daniel was standing on the sidewalk, looking into the street, when Rivas struck him once or twice in the jaw. Rivas struck Daniel without provocation; neither had said anything to the other before the fight. Daniel fought back. They were the only ones fighting.[12] Opinions differed on who was winning. According

---

[11] Upon becoming aware something was happening, people began running through the garage from the backyard to the front.

[12] The testimony at trial was that Daniel and Rivas were the only ones fighting. However, Jose Flores, a good friend of the Serrano family, gave a statement to Deputy Avila in which he related that René and Ricardo both were arguing with "those guys" (presumably, defendants). Vanessa Serrano gave a statement in which she said she saw Flores and Daniel fighting with several subjects in front of the residence, and that she also saw René fighting. Yolanda told Deputy Avila that when she heard someone tell someone in the backyard that there was a fight, René was already out there fighting.

to Yolanda, defendants had all moved out to the street by this time. However, Elizalde did not see Coronado or Torres anywhere.

Flores saw René heading toward Daniel. Something else appeared to draw René's attention, and he turned the other way and quickly walked toward Coronado as if they were going to fight. Vanessa saw Coronado then pull a small black gun from his waist, point it at René, and shoot him one time in the stomach. She did not see any other weapons. Torres was standing about an arm's length from Coronado when Coronado fired. He did not do anything as Coronado was pulling out the firearm. Nothing gang related was said. Flores (who did not see a gun in Coronado's hand but saw the flame come out of the barrel) estimated Coronado shot René when the two were about four feet apart.

According to Vanessa, Coronado walked away after he fired the shot. Torres went in the same direction. According to Elizalde, who did not see the shooting but heard one shot, defendants ran in the direction of Coronado's house. Rivas was first, Torres was behind him, and Coronado was last. According to Ricardo, who likewise did not actually see the shooting but heard one shot, Coronado immediately walked away and defendants all left. Yolanda confirmed there was only one shot; she did not see Torres or Rivas at the time of, or after, the gunshot, although she saw Coronado get into a small, dark blue car. According to Daniel, however, he saw Torres walking away from the house before the gunshot went off. At the time the shot was fired, Torres was already down the street.

Shot in the upper abdomen, René was hospitalized for close to a month, during which time he underwent three surgeries due to his injuries and resulting infections. As of the time of trial, he had undergone five operations, and had lasting physical effects, as a result of the gunshot wound.

On September 28, 2009, a search was conducted at Coronado's residence. A McDonald's restaurant bag containing a box of twenty .22-caliber rounds was found inside an old sofa in the backyard.

7.

That same morning, Senior Deputy Marvin Gomez and Deputy Andrew Avila spoke to Coronado at the residence.[13] Coronado related that Elizalde had invited him to the party. When Coronado asked who would be there, Elizalde said he would have some people from Delano who were Nortenos, but that they were going to "keep everything cool." As soon as Coronado arrived, however, he felt tension. A lot of people were wearing red. Coronado mentioned to Elizalde that some of the partiers were drunk and looking at him funny, like there were going to be problems, but Elizalde told him not to worry about it.

Coronado related that later, after the beer ran out and people started drinking hard liquor, he decided it was time to go. As he started walking out through the garage, "all the chaos started happening." Coronado heard people yelling "fuckin' scrapes [sic]," then, when everyone started running in and out of the garage and to their vehicles, he left. He was wearing a Steelers jersey bearing the number 10. When people were yelling "scrapes [sic]," he assumed they thought he was Southern.

Coronado related that he heard one gunshot, but did not realize anyone had been shot. When he got home, however, his "old lady" told him she heard gunshots on the street and right behind the house. Coronado estimated he got home around 10:00, then he stayed in an abandoned house down the street. He denied shooting anybody or having a gun on him.

Gomez and Avila interviewed Torres later that same day.[14] Torres denied being at the party, and said he was with his wife and children at his mother's house. Confronted with a photograph taken at the party, however, he admitted he and his wife were there, but stated they left and he did not know what happened. He related that Elizalde had

---

**13** An audio recording of the interview was played for the jury.

**14** An audio-video recording of the interview was played for the jury.

invited them.  At some point, it seemed like everyone went into the garage.  He and his wife also went in; they heard a gunshot and then left.

*The Gang Expert's Testimony*

Senior Deputy Gomez testified as the prosecution's gang expert.  He was familiar with the Okie Bakers, which, the parties stipulated, was a criminal street gang within the meaning of the Penal Code.  The gang's primary activities were murder, attempted murder, illegal possession of guns, drug sales, carjacking, and drive-by shootings.

Gomez explained that the Okie Bakers were a Southern Hispanic street gang. Southern Hispanic gangs claim allegiance to the Mexican Mafia prison gang.  Southern Hispanic gang members "are the soldiers for the Mexican Mafia."  Although Southern gang members are all over now because of family members being incarcerated in Northern California, the traditional stronghold for Southern Hispanic gangs is the city of McFarland on south.  The color blue and number 13 are associated with Southerners. Nortenos are the arch rival of Southerners.  They claim their allegiance to the Nuestra Familia prison gang, with that group calling the shots for all the foot soldiers, which are called Nortenos or Northerners.  The geographic location for Nortenos is Delano on north.  The color red and number 14 are associated with Northerners.

Gomez explained that throwing gang signs at someone is a form of disrespect.  In addition, "scraps" or "scrapas" is a term used by Northerners to disrespect Southern Hispanic gang members.  Especially with Hispanic gangs, respect is somewhat synonymous with fear.  The level of respect "is a big deal."  Gomez further explained that a moniker is a nickname gang members use to identify themselves.  Coronado's moniker was Clover, Torres's moniker was Cruiser, and Rivas's monikers were Scooby, Little Scooby, and Scoobs.

In researching defendants, Gomez reviewed offense reports, field interview cards, street checks, photographs, bookings, tattoos, and associates, and also had conversations with defendants.  Based on these items (which Gomez detailed for the jury), together with

9.

his training and experience, Gomez opined that on September 26, 2009, defendants were members of, and active participants in, the Okie Bakers criminal street gang.

Gomez also reviewed the reports and information generated in the current case. In answer to hypothetical questions tracking the evidence presented by the prosecution, Gomez opined that the shooting in this case was done in association with the Okie Bakers street gang, since there were three gang members involved. Gomez further opined the shooting was for the benefit of the gang, because attempting to kill or shoot a gang rival instills fear in the witnesses and citizens in the area and the community, which in turn makes citizens in the community reluctant to report illegal activities of the gang. Gomez additionally opined that the shooting furthered the criminal activity of the gang by making citizens scared to report the illegal activities of the gang.

In Gomez's opinion, possession of a firearm by an Okie Bakers member, who is a felon prohibited from possessing a firearm, would also be for the benefit of, and in association with, the Okie Bakers criminal street gang, because possessing a firearm that is ready for use offensively to shoot somebody benefits the gang when attacking rival gang members. Possession of a firearm also promotes, furthers, or assists gang members in criminal conduct, because being known for carrying and using weapons and not being afraid to use violence against citizens or rival gang members allows the gang to continue with its criminal activity. Similarly, possessing ammunition would benefit the gang because it could be placed into a firearm, and a firearm could then be used to shoot a rival gang member or citizens. That act would further the gang's criminal activity by its effect on the gang's reputation. Using firearms instills fear in the community, which in turn makes citizens not want to report the gang's illegal activities.

B. DEFENSE EVIDENCE

Alejandro Serrano was in the backyard with his girlfriend when he heard yelling coming from the front yard. René was not in the backyard at the time. Alejandro quickly went out to the front through the garage. Ricardo was right behind him. Once Alejandro

10.

got out front, he saw a bunch of males "kind of scuffling." Defendants were three of the four or five men involved. Then he heard the gunshot, which sounded like it came from a .22-caliber handgun, and "everybody just scattered." The muzzle flash came "from the scuffling." During the time he was in the backyard, Alejandro did not hear any insults or anything about gang activity. He did not see any kind of weapon.

Harlan Hunter testified as a gang expert. He reviewed various materials, including employment records and police reports, with respect to Coronado. Based on everything he reviewed, Hunter opined that on September 26 and 27, 2009, Coronado was not a member of the Okie Bakers, and had, in fact, gotten out of the gang in early to mid-2007. Hunter did not conduct any review with respect to Torres or Rivas.

## DISCUSSION

### I. SUFFICIENCY OF THE EVIDENCE

Rivas and Torres contend the evidence is insufficient to sustain their convictions for possession of a firearm by a felon. We agree.

The standard of review by which we assess such a claim applies regardless of whether the prosecution relies primarily on direct or on circumstantial evidence. (*People v. Lenart* (2004) 32 Cal.4th 1107, 1125.) The test of sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the judgment below, substantial evidence is disclosed such that a reasonable trier of fact could find the essential elements of the crime beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578; accord, *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) Substantial evidence is that evidence which is "reasonable, credible, and of solid value." (*People v. Johnson*, *supra*, at p. 578.) An appellate court must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Reilly* (1970) 3 Cal.3d 421, 425.) An appellate court must not reweigh the evidence (*People v. Culver* (1973) 10 Cal.3d 542, 548), reappraise the credibility of the witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact (*In re*

11.

*Frederick G.* (1979) 96 Cal.App.3d 353, 367). "If the circumstances, plus all the logical inferences the jury might have drawn from them, reasonably justify the jury's findings, our opinion that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citations.]" (*People v. Tripp* (2007) 151 Cal.App.4th 951, 955.)

"Before the judgment of the trial court can be set aside for insufficiency of the evidence to support the verdict of the jury, it must clearly appear that upon no hypothesis whatever is there sufficient substantial evidence to support it. [Citation.]" (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) However, "[e]vidence which merely raises a strong suspicion of the defendant's guilt is not sufficient to support a conviction. Suspicion is not evidence; it merely raises a possibility, and this is not a sufficient basis for an inference of fact. [Citations.]" (*Ibid.*)

### Possession of a Firearm by a Felon

"The elements of the offense proscribed by section 12021 are conviction of a felony and ownership, possession, custody or control of a firearm. [Citations.] Knowledge is also an element of the offense. [Citation.]" (*People v. Jeffers* (1996) 41 Cal.App.4th 917, 922; accord, *People v. Snyder* (1982) 32 Cal.3d 590, 592.) "No specific criminal intent is required, and a general intent to commit the proscribed act is sufficient to sustain a conviction. [Citations.]" (*People v. Snyder*, *supra*, at p. 592.) "The elements of unlawful possession may be established by circumstantial evidence and any reasonable inferences drawn from such evidence. [Citations.]" (*People v. Williams* (1971) 5 Cal.3d 211, 215.)

It is undisputed there was no evidence Rivas or Torres actually physically possessed a firearm on the night in question.[15] Indeed, none of the witnesses had any

---

[15]     The parties stipulated defendants were felons and prohibited by law from possessing a firearm.

12.

idea, prior to Coronado pulling the gun from his waist area and firing, that there was even a gun at the party. Accordingly, we must determine whether there was substantial evidence Rivas or Torres constructively possessed the gun, or aided and abetted Coronado's possession of it.

"Constructive possession occurs when the accused maintains control or a right to control the contraband; possession may be imputed when the contraband is found in a place which is immediately and exclusively accessible to the accused and subject to his dominion and control, or to the joint dominion and control of the accused and another. [Citation.]" (*People v. Williams, supra,* 5 Cal.3d at p. 215.) "The accused also has constructive possession of [contraband] that [is] in the physical possession of his agent or of any other person when the defendant has an immediate right to exercise dominion and control over the [contraband]. [Citations.]" (*People v. Francis* (1969) 71 Cal.2d 66, 71.) "The inference of dominion and control is easily made when the contraband is discovered in a place over which the defendant has general dominion and control: his residence [citation], his automobile [citation], or his personal effects [citation]. However, when the contraband is located at premises other than those of the defendant, dominion and control may not be inferred solely from the fact of defendant's presence, even where the evidence shows knowledge of the presence of the [contraband] …." (*People v. Jenkins* (1979) 91 Cal.App.3d 579, 584.)

A conviction for possession of contraband may also be upheld where there is evidence the defendant aided and abetted another in committing the crime of possession. (*People v. Francis, supra,* 71 Cal.2d at p. 72.) "A 'person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.' [Citation.]" (*People v. Marshall* (1997) 15 Cal.4th 1, 40.) "Aiding and abetting does not require participation in an agreement to commit an offense,

13.

but merely assistance in committing the offense. [Citation.]" (*People v. Morante* (1999) 20 Cal.4th 403, 433, fn. omitted.) Factors that may be considered in determining aiding and abetting include presence at the crime scene, companionship, and conduct before and after the offense. (*In re Juan G.* (2003) 112 Cal.App.4th 1, 5.) However, mere presence at the scene of an offense is not sufficient, standing alone, to sustain a conviction. (*People v. Miranda* (2011) 192 Cal.App.4th 398, 407.)**16**

Leaving aside the gang expert's testimony, the evidence in the present case showed Rivas, Torres, and Coronado attended the party together and, after the shooting, fled at the same time, at least according to some witnesses. They sat at the same table during the party, and were together when Rivas confronted Ricardo in the garage. At the time the shot was fired, Rivas was fighting with Daniel Serrano. Torres was an arm's length from Coronado when the latter pulled the gun; Torres did nothing.

The foregoing does not support a reasonable inference Rivas or Torres knew Coronado possessed a firearm, let alone that either of them had the right to exercise dominion and control over it. Similarly, no conduct by Rivas or Torres assisted Coronado in achieving his unlawful possession of the gun. (See *People v. Thompson* (2010) 49 Cal.4th 79, 117.) Although one gang member's "act of standing backup" can, depending upon the circumstances, reasonably be inferred to have aided and encouraged another gang member's commission of a crime (see *People v. Gonzales and Soliz* (2011)

---

**16** "'A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime…. [Citation.]' [Citation.] Liability under the natural and probable consequences doctrine 'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.' [Citation.]" (*People v. Medina* (2009) 46 Cal.4th 913, 920.)

The Attorney General implicitly concedes the natural and probable consequences doctrine does not apply to the facts of the present case.

52 Cal.4th 254, 296), no such inference can reasonably be drawn from Torres's conduct here because there is no evidence he or anybody else knew Coronado was armed. We might *speculate* Torres and Rivas were aware of the gun's presence; it is also *possible* either or both had the right to exercise dominion and control over it should they wish to do so. However, "a mere possibility is nothing more than speculation" (*People v. Ramon* (2009) 175 Cal.App.4th 843, 851), and "'speculation is not evidence, less still substantial evidence.' [Citations.]" (*People v. Waidla* (2000) 22 Cal.4th 690, 735.) As the California Supreme Court has stated, "We may *speculate* about any number of scenarios that may have occurred on the [evening] in question. A reasonable inference, however, 'may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] … A finding of fact must be an inference drawn from evidence rather than … a mere speculation as to probabilities without evidence.' [Citations.]" (*People v. Morris* (1988) 46 Cal.3d 1, 21, disapproved on another ground in *In re Sassounian* (1995) 9 Cal.4th 535, 543-544, fn. 5 & 545, fn. 6.)

In arguing the evidence is sufficient to uphold the convictions, the Attorney General points to the testimony of Senior Deputy Gomez, the People's gang expert. Gomez described, in part, a Bakersfield Police Department report, dated December 4, 2006, of a case in which Coronado was found driving a vehicle. He had blood on his shirt. Torres, one of four passengers in the vehicle, had a loaded handgun in his waistband. When asked if anyone else inside the vehicle knew he had the handgun, Torres related that Coronado and the other male passenger both knew, because "he didn't want to do them dirty." Coronado and Torres both admitted being Okie Bakers. Gomez explained that "[d]oing somebody dirty" is disrespecting them by not letting them know there is a firearm in the vehicle or in the person's possession.

Gomez also described an offense report, dated August 20, 2005, in which a sheriff's deputy made a traffic stop on Torres and two other subjects. One of the subjects had a firearm on his person. Gomez found this significant because Torres, a self-

15.

admitted Okie Baker, was in Okie Bakers territory with two other subjects, one of whom was armed. Gomez explained that the firearm was capable of being passed around and used by the other gang members. It was readily available.

In addition, Gomez described a sheriff's report, dated May 8, 2001, in which Rivas was identified as having handed off a handgun to someone who then shot Tommy Tillery. Gomez found this significant because Tillery was beating up one of the subjects who was involved. Handing off a firearm to another person so that person could shoot the victim who was winning the assault showed the three subjects were working together to get the victim, Tillery. Gomez explained that "to back up somebody" means to offer protection to a fellow gang member. If that person gets in a fight, the other gang member is expected to back him up because not doing so would be disrespecting the person.

As the Attorney General acknowledges, the jury was admonished at the outset of Gomez's testimony that Gomez was going to testify "regarding gang and gang activity as to one or all of the defendants," and that his testimony was "going to go to the defendants as to their gang activity in this case." During the course of jury instructions, jurors were told:

> "Deputy Marvin Gomez testified in part for the People for a limited purpose; that is, as a gang expert.[17]

> "*The opinions expressed by the deputy relate to the gang enhancements* alleged in the Information in Counts 1 through 4 for Joe Coronado; Counts 1 through 3 for Hilario Torres; and Counts 1 through 3 for Allen Rivas; *and the alleged violation of Penal Code Section 186.22(a)*, in Count 5, for each defendant.

> "*Part of the information relied upon by the officer, that is, certain police reports, field interview cards, booking sheets, tape recorded statements, personal contacts, and/or transcripts involving alleged criminal*

---

**17** Gomez also testified concerning his investigation of the shooting itself.

*conduct attributed to other individuals or to the defendants were not being offered for the truth of the matter stated therein.*

"*Such information is being used to show the basis upon which the officer arrived at his opinions.*

"The opinions of the deputy and the information upon which he relies is not being offered to show that the defendants are of bad character or have a disposition to commit the crimes charged in the information.

"*You may consider such testimony only for the limited purpose for which it is being offered.*"  (Italics added.)

The offense-report information recited by Gomez was not admitted, nor was it admissible, for the truth of the matters contained in the reports.  "[A] witness's on-the-record recitation of sources relied on for an expert opinion *does not transform inadmissible matter into 'independent proof' of any fact.*  [Citations.]"  (*People v. Gardeley* (1996) 14 Cal.4th 605, 619, italics added; see *People v. Ramirez* (2007) 153 Cal.App.4th 1422, 1427.)

Moreover, Gomez's testimony produced nothing more than speculation as to what possibly occurred on the night of the party.  Even if we were to draw an inference from it that Rivas and Torres may have known Coronado possessed a firearm, this is insufficient since, even assuming knowledge, the testimony does not give rise to an inference they had the right to exercise dominion and control over the gun.  That the gun may have been *capable* of being passed around and used by all is simply not enough.

*People v. Sifuentes* (2011) 195 Cal.App.4th 1410 (*Sifuentes*) is instructive.  In that case, police found Sifuentes and Lopez — both convicted felons — in a motel room.  When the officers entered, Sifuentes was lying on top of the bed nearest the door, while Lopez was kneeling on the floor on the far side of the second bed.  A loaded handgun was subsequently found under the mattress next to where Lopez had been kneeling.  (*Id.* at pp. 1413-1414.)

17.

At trial, a gang expert testified, based on arrest reports, field interviews, defendants' past association with other gang members, and other police contacts and information, that Sifuentes and Lopez were active participants in Santa Ana's Delhi criminal street gang on the day of their arrest. The expert based his opinion on several prior incidents in which defendants possessed weapons. This information was offered as foundation for the expert's opinions, not to prove defendants possessed a weapon on the current occasion. (*Sifuentes*, *supra*, 195 Cal.App.4th at pp. 1414-1415 & fn. 2.) The expert further testified "that weapons, particularly guns, play a prominent role in the gang subculture. [The expert] defined a 'gang gun' as a gun that is passed freely among gang members to use in their criminal endeavors. He explained that aside from 'certain restrictions,' a gang gun is 'accessible' to all gang members '[a]t most times.' Gang members 'frequently and almost are [*sic*] required to share information about the possession of gang guns and where they're kept.' A gang member possessing a gun will inform other gang members he has a firearm for two reasons: (1) possession of a gun garners respect within the gang for the possessor, and (2) to alert other gang members who are subject to probation or parole terms that prohibit them from knowingly associating with anyone carrying a gun." (*Id*. at p. 1415.) The expert further opined that a gang's possession of guns promoted, furthered, or assisted its felonious criminal conduct, because possession facilitated its criminal endeavors and enhanced its reputation. He asserted that a gang member's mere possession of a gun "'"at the ready"'" benefits the gang, but admitted he had no information that Lopez kept a gun for the gang, and that no direct evidence tied Lopez's gun to other gang members or to its use by the gang. (*Id*. at p. 1416.)

Sifuentes and Lopez were convicted, inter alia, of possession of a firearm by a felon. (*Sifuentes*, *supra*, 195 Cal.App.4th at p. 1413.) Sifuentes's conviction was obtained based on the doctrine of constructive possession. (*Id*. at p. 1417.) On appeal, he claimed the evidence was insufficient to support the requisite conclusion he had the right

18.

to control the firearm discovered near Lopez.  (*Id*. at p. 1413.)  The Court of Appeal

agreed.  It reasoned:

> "The prosecution's gang expert did not testify *any* gun possessed by a gang member automatically constitutes a gang gun to be shared with all other gang members.  Rather, the gang expert explained gangs use gang guns offensively and defensively to commit crimes and assault their rivals.  Under those circumstances, firearms are freely shared and therefore gang members will know who among them has possession of these weapons.  There was no evidence, however, the gun officers discovered had ever been used in this manner.

> "Even assuming the firearm Lopez possessed fell into the gang gun category, no evidence showed Sifuentes had the right to control the weapon.  The gang expert did not testify all gang members always have the right to control a gang gun, whether kept in a safe place or held by another gang member.  Rather, the expert testified a gang gun was 'accessible' to gang members 'at most times,' but did not elaborate.  When asked if 'every single [gang] member' could use the gang gun, the expert responded 'certain restrictions' applied, but failed to describe the nature of those restrictions.  Based on the expert's testimony, it also may be that gang members have no right to control a firearm held by a compatriot where no offensive or defensive actions are undertaken.  That was the case here, where Sifuentes and Lopez simply occupied a motel room with two females.  There was no evidence defendants had used or were about to use the gun offensively or defensively.  Consequently, there is no basis to conclude Sifuentes had the right to control the weapon.

> "The Attorney General argues the jury could have relied on information that in 1997 Sifuentes gave his female companion a firearm to hide in her purse, and she later told an investigator that Sifuentes always carried a weapon.  [The expert] testified about this incident based on a 1997 police report, which reported the female companion's statement ….  Although the trial court overruled Sifuentes's hearsay objection, the court did not admit the female companion's statement for its truth, but as part of the basis for the expert's opinion Sifuentes was an active participant in the Delhi gang.  [Citation.]  We therefore may not consider the hearsay statements of Sifuentes's female companion in assessing whether Sifuentes constructively possessed the firearm Lopez attempted to hide.

> "The Attorney General also claims the expert testified the gun was 'jointly possessed,' but no evidence supports this assertion.…  The

19.

prosecutor did not elicit, and the expert did not testify that a hypothetical individual in Sifuentes's position would have the right to control the firearm discovered under the mattress.

"The prosecutor failed to elicit from the expert any substantial evidence Sifuentes had the right to control the firearm. The expert did not testify all gang members had the right to control communal gang guns, assuming this firearm fell into that category. Rather, as discussed above, he testified certain restrictions applied concerning 'access' to a gang gun and did not explain these restrictions or whether he equated access with a right to control. Nor did the expert link Sifuentes to the particular firearm found next to Lopez.

"Thus, the evidence falls far short of providing substantial evidence Sifuentes had the right to control the firearm in this case." (*Sifuentes, supra,* 195 Cal.App.4th at pp. 1417-1419, fns. omitted.)

In the present case, the Attorney General seeks to distinguish *Sifuentes*. She says: "First, the incident reports relied on by Deputy Gomez in forming his opinion, established that these appellants had a propensity to share gang guns in the past. Second, the incident reports further established that the Okie Baker gang and these appellants considered it a sign of disrespect not to inform other gang members that a fellow gang member was armed with a firearm. Third, the evidence in this case indicates that appellants acted in concert with one another by sitting together during the party, accompanying each other to the garage when confronting Ricardo Serrano about use of gang signs, accompanying each other to the front of the house where the altercation and shooting occurred and, immediately after Coronado shot René Serrano, all three appellants fled the scene of the shooting. [¶] Thus, the jury was [*sic*] could reasonably infer that appellants had knowledge of, and joint or constructive possession of the gun. The above evidence, taken together, supports a logical inference, drawn from circumstantial evidence, that appellants knew Coronado possessed a firearm, and that it was available for their use if needed, and that he would use it if necessary to protect fellow gang members, to wit, Rivas and Torres."

The Attorney General overstates the effect of Gomez's testimony, and blurs the line between permissible and impermissible use of the incident reports.[18] Even if we were to assume the evidence showed defendants had a propensity to share gang guns, there is nothing to suggest the gun possessed by Coronado was such a gun as opposed to his personal weapon, or that the gun was immediately available to Torres and/or Rivas. Gomez did not testify that if one Okie Baker possesses a gun, his fellow gang members all have the right to exercise dominion and control over it. That such a gun is "capable of being passed around" does not change this. Moreover, knowledge that a companion who is a fellow gang member possesses a firearm does not constitute the right to exercise

---

[18]   The prosecutor did much the same thing at trial, telling jurors: "Finally …, you might have some questions on felons in possession of a firearm. How is it that all three defendants are charged with a firearm when Coronado's the only one who had possession of it? [¶] If you read that instruction, it talks about possessing, possession, if I have the right to control it, okay, or although it's not on my person at that particular moment, I still am technically, and under the law, in possession of it. [¶] Do you remember when we talked to -- to Deputy Gomez about the -- the gang evidence? [¶] Deputy Gomez relied on an incident where Hilario Torres told officers that there was a firearm and he didn't want to do his friends dirty. Meaning he didn't want to not let his friends who were with him know he had the firearm because that's what gang members do. [¶] When you're in a gang -- and, again, this is irrational to some people, but -- and that's why we have our expert. You know, when you're doing these types of crimes and you're in a gang, you know, when you're -- when you're a member, you know what your gang member friends are doing and what they're possessing. You know if your buddy's selling -- selling dope. You know if your buddy has a firearm when you go out. You know this because you guys are all together and it's part of what you guys do. [¶] So that's why all three defendants are charged with that crime, because each one of them had to have known that Coronado had that firearm when the incident occurred." The prosecutor reiterated this argument in his closing summation.

It is improper for a prosecutor to argue in such a way as to obscure the limited nature of the evidence in question. (See *People v. Clark* (1993) 5 Cal.4th 950, 1008-1009, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Although defendants forfeited any claim of prosecutorial misconduct by failing to object to the prosecutor's remarks (*Clark*, *supra*, at p. 1008), this does not mean we can now consider Gomez's testimony for any and all purposes.

21.

dominion and control over that firearm. Defendants' actions at the party do not alter this fact.[19]

The evidence adduced at trial is insufficient to establish that Torres and/or Rivas had possession, whether actual or constructive, of a firearm on the night in question, or that they aided and abetted Coronado's possession of a firearm. Accordingly, the judgments in Kern County Superior Court case Nos. BF129529B and BF129529C must be reversed. Retrial in those cases is barred. (*People v. Anderson* (2009) 47 Cal.4th 92, 104 & cases cited.) Our disposition renders Torres's and Rivas's remaining contentions moot.

## II. *BATSON/WHEELER* CLAIM

At trial, defendants jointly brought a *Batson/Wheeler* motion on grounds that six of the prosecutor's seven peremptory challenges were used against women, of whom four were Hispanic females. The trial court found that the defendants had stated a prima facie case of improper use of peremptory challenges and, after explanation by the prosecutor, found that the prosecutor excused the jurors for race-neutral reasons. Coronado alone now challenges the prosecutor's explanation for excusing one of those prospective jurors, Doris O., for failing to satisfy *Batson/Wheeler* requirements. The six other challenges are not questioned in this appeal. We find no violation of *Batson/Wheeler*.

"The purpose of peremptory challenges is to allow a party to exclude prospective jurors who the party believes may be consciously or unconsciously biased against him or her." (*People v. Jackson* (1992) 10 Cal.App.4th 13, 17.) Peremptory challenges may properly be used to remove prospective jurors believed to entertain specific bias, i.e., bias

---

**19** The Attorney General concedes that the only circumstantial evidence of constructive possession emanates from Gomez's testimony based on the prior incident reports, and defendants' actions during the party. She says if we conclude that evidence and the inferences that might be drawn therefrom run afoul of *Sifuentes*, there was insufficient evidence to convict Rivas and Torres of violating section 12021.

regarding the particular case being tried or the parties or witnesses thereto. (*Wheeler*, *supra*, 22 Cal.3d at p. 274.) "There is a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination. [Citations.]" (*People v. Bonilla* (2007) 41 Cal.4th 313, 341.)

However, "'[a] prosecutor's use of peremptory challenges to strike prospective jurors on the basis of group bias — that is, bias against "members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds" — violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution. [Citations.] Such a practice also violates the defendant's right to equal protection under the Fourteenth Amendment to the United States Constitution. [Citations.]' [Citation.]" (*People v. Bell* (2007) 40 Cal.4th 582, 596; see *Batson*, *supra*, 476 U.S. at pp. 88-89; *Wheeler*, *supra*, 22 Cal.3d at pp. 276-277.)

"The United States Supreme Court has … reaffirmed that *Batson* states the procedure and standard to be used by trial courts when motions challenging peremptory strikes are made. 'First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citations.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.] Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide … whether the opponent of the strike has proved purposeful racial discrimination." [Citation.]' [Citation.]" (*People v. Avila* (2006) 38 Cal.4th 491, 541, quoting *Johnson v. California, supra,* 545 U.S. 162, 168.) The California Supreme Court has "endorsed the same three-part structure of proof for state constitutional claims. [Citations.]" (*People v. Bell, supra,* 40 Cal.4th at p. 596, see *Wheeler*, *supra*, 22 Cal.3d at pp. 280-282.)

With these principles in mind, we turn to the case before us.

### *Factual Background*

Rosa H., Debra R., and Linda B. were among the first 18 prospective jurors examined during voir dire. They provided the following information in response to questions from the court. Rosa H. related that she was a housewife with two children in high school. When she lived in Los Angeles, she had a friend or friends whom the police accused of being in a Hispanic gang. Rosa H. did not believe they were in a gang. She had no feelings about gangs, and stated she could set aside what happened in Los Angeles and judge the facts of this case solely on the evidence.

Debra R. related that she worked in the receiving department of a shoe business and had three children, all over age 18. Neither she nor anyone close to her had been the victim of gang violence or accused of being in a gang, nor had she witnessed or investigated a gang crime.[20] She was convicted of misdemeanor trespassing five years earlier, but felt she was treated fairly and it would not affect her ability to be fair to both sides. In addition, her husband had gotten into a fight with his brother-in-law over 10 years earlier. He was charged with attempted murder, but after investigation, the charges were dropped. She did not have any problem with law enforcement or the court system as a result.

Linda B. related that she was retired. Her three grandchildren were all in school. Approximately 10 years earlier, her friend was assaulted, and the friend's car vandalized, in what may have been a gang-related incident. Linda B. believed she could judge the present case fairly and solely on the evidence presented. In addition, her nephew had been stabbed in a street fight about 10 years earlier. Linda B. stated that nothing about

---

[20]     The gang-related information was initially obtained by means of a confidential questionnaire filled out by each prospective juror. If a prospective juror answered any question(s) affirmatively, the subject was then explored further out of the presence of the other prospective jurors.

the incident would affect her ability to be fair to both sides. Her grandson was charged with assault as a juvenile three years earlier. He was acquitted. Although she felt he was fairly treated by law enforcement, she felt he was not fairly treated by the prosecuting attorney. This took place in Kern County. She was positive she would not hold this against the prosecutor in the present case.

The prosecutor did not question any of these prospective jurors individually. He used his first peremptory challenge to excuse Rosa H., and his second peremptory challenge to excuse Debra R.

After the prosecutor and defendants (acting jointly) had each excused three prospective jurors, Rafaela O. and Aida S. were among those examined by the court. Rafaela O. related that she was divorced and had two adult children. Although neither she nor anyone close to her had been the victim of gang violence or accused of being in a gang, nor had she witnessed or investigated a gang crime, her home and vehicles had been broken into multiple times, and a relative of hers was stabbed almost 30 years earlier. Sometimes she thought he had it coming to him, because he was "one of those kind of kids." She stated that none of the incidents would have any bearing on how she viewed this case, although she conceded that, if she had a chance to extend leniency to the person who stabbed her relative because her relative deserved it, she "[p]ossibly" would do so. In addition, her brother-in-law was arrested for selling narcotics and drug use. She "guess[ed]" he was fairly treated by law enforcement, explaining that she felt they "should have kept him longer." The incident would not affect her ability to be fair to both sides.

Aida S. related that she was a registered nurse who did recovery room nursing. In the course of her employment, she had seen a lot of gunshot and stab wounds. She stated that if there was testimony about some sort of wound or injury, she would take the evidence as it was presented and not second-guess what someone else did or how he or she treated the problem. Neither she nor anyone close to her had been the victim of gang

25.

violence or accused of being in a gang, nor had she witnessed or investigated a gang crime.

The prosecutor questioned Rafaela O., but not Aida S., individually. He used his fourth peremptory challenge to excuse Linda B., his fifth peremptory challenge to excuse Rafaela O., and his sixth peremptory challenge to excuse Aida S. After the defense followed each of the prosecutor's strikes with a joint excusal, the prosecutor accepted the panel as constituted at that time. The defense then jointly exercised another peremptory challenge, after which seven more prospective jurors were called for questioning. Doris O. was among this group, although she was not seated as one of the twelve in the jury box.

Doris O. related that she was a yard supervisor for the Wasco School District. She was married, had four children, one of whom was still in high school, and six grandchildren. According to her answers to the questions contained in the confidential questionnaire, neither she nor anyone close to her had been the victim of gang violence or accused of being in a gang, nor had she witnessed or investigated a gang crime. She answered negatively when counsel for Rivas asked her if she believed she was a god. She believed she paid attention to everything that had happened during trial to that point, and she never "started nodding."[21] Counsel for Rivas continued to question Doris O. as follows:

"Q: … [D]o you think that it is possible for that thing to fall off that – the emergency lighting fixture on that wall, to fall off in two minutes and kill Mr. (1776491?)

"A: No.

"Q: Okay. [¶] Is it likely that that's going to happen?

---

[21] At one point during its voir dire, the trial court asked her if she was doing okay. The reason for the inquiry is not apparent from the record.

"A: No.

"Q: But it is possible that it could happen, correct?

"A: Yes. I mean, yeah.

"Q: All right. Now, the Judge is going to tell you what the standard is that he needs to meet in order to prove his case.

"A: Okay.

"Q: Now, if it was a civil case, it would be a preponderance of the evidence. Fifty percent lean a little bit, and you get yourself a verdict, right?

"A: Right.

"Q: If they wanted to take your kids away from you –

"A: Uh-huh.

"Q: -- it's clean and convincing evidence. It's a higher standard.

"A: Okay.

"Q: If you were a god, it goes beyond all doubt.

"A: Right.

"Q: Because God is all knowing.

"A: Right.

"Q: For criminal cases, beyond a reasonable doubt. The highest standard in law.

"A: Okay.

"Q: You buy that?

"A: Yes.

"Q: Why?

"A: Because that's what the Judge will tell me.

"Q: And the Judge tells you anything that has to do with what?

27.

"A: The law.

"Q: The law. [¶] Now, who decides what the facts are in this case?

"A: The Judge? Or no.

"Q: No. [¶] Let the record reflect I was nodding my head vigorously. [¶] No. You do that.

"A: I do that?

"Q: Yes. That's why we're picking 12 jurors.

"A: Okay.

"Q: You become the judges of fact. [¶] Do you understand that?

"A: Okay.

"Q: You have a problem with that?

"A: No."

The prosecutor then questioned Doris. O. and asked whether she watched over children when they went out on recess. She responded that she had been a yard supervisor for 18 years at different schools in Wasco. Presently, the children were kindergarten through sixth grade. When the prosecutor asked if she ever watched over older children, "like seventh, eighth grade, high school," she responded that she had before, but not high schoolers.

After the parties passed for cause, the prosecutor accepted the panel of 12 jurors four times. After the defense's next joint strike, Doris O. was moved into the jury box. The prosecutor immediately excused her. Shortly after, court adjourned for the weekend.

The following Monday morning, at the outset of the next court session, counsel for Rivas brought a *Batson/Wheeler* motion on behalf of the defendants jointly on the ground that six of the prosecutor's seven peremptory challenges were used against

women, of whom four (Doris O., Debra R., Rosa H., and Rafaela O.) were Hispanic females.[22]  The trial court noted that the prosecutor had also excused a Hispanic male.

After the trial court outlined the analytical steps of a *Batson-Wheeler* motion and a brief summary of requirements of the first step, the trial court found the motion was timely, and that a prima facie showing had been made.  Accordingly, it asked the prosecutor for an explanation of his strikes against females.  This ensued:

> "MR. LOUIE [prosecutor]:  Okay.
>
> "[Rafaela O.] stated she had a relative who was stabbed that had it coming to him.…  [A]lthough every other person who I talked to about that said that that wouldn't be right and that's not something that they would consider, … she continued to maintain that belief.  And that's the reason why I show [*sic*] her.
>
> "[Doris O.] works with children, seventh and eighth graders, in Wasco.  I know Wasco to be an area that has Hispanic gang populations, especially at that age group.
>
> "She did mention that.  She did mention something about seventh and eighth graders and kids being involved in that -- in that type of activity, which is the reason why I struck her.
>
> "[Rosa H.] … stated that her friends were accused of being in a gang in L.A., a -- Hispanic gangs, and the police accused the friends of her wrongly of being in that gang.  I think she might have some bias … against the police for accusing her and her friends of being in a gang when they really weren't.
>
> "That was [Rosa H.]

---

[22]   Counsel for Rivas named Angela R. instead of Debra R.  We assume he misspoke, since Angela R. was excused for cause based on her answers concerning the confidential questionnaire.  (Apparently, there were three persons in the venire with the last name R.)  There is no indication in the record that the prosecutor or the court were given prior notice of the motion.

"[Debra R.] had a misdemeanor conviction for trespassing. I also noticed that she had … what looked to be a fairly large, yet faded, so it was probably old, tattoo, of some flowers and roses around her left wrist.

"The main reason was because of the misdemeanor for trespassing that I struck her.

"[Linda B.] stated … that her grandson was not fairly treated at juvenile. Again, that shows some bias or prejudice against law enforcement and the Court system. Although she, I do not believe, is Hispanic.

"[Aida S.] is not Hispanic, either, but she is a nurse, and she has seen gunshot wounds. Her information on gunshot wounds and how things … such as that are treated and injuries involved with that, which is why I struck her. [¶] … [¶]

"THE COURT: All right. Miss Kim [counsel for Coronado], any comments?

"MS. KIM: No, Your Honor.

"THE COURT: Mr. Carter [counsel for Torres]?

"MR. CARTER: … [R]egarding [Aida S.], … I think the D.A. himself went through a process of trying to say that she would ignore what she knows and she would listen to the testimony on the stand. That she would rely on what was presented to her on the stand, and she agreed with that. [¶] … [¶]

"As to the trespass misdemeanor, I'm not quite sure why misdemeanor trespass indicates bias. That … was on [Debra R.].… [M]y recollection was we had at least one or perhaps two males who also mentioned they had misdemeanor trespass.… So I don't recall exactly what happened to them along the way, but it doesn't seem to me that misdemeanor trespasses in the past is any reason to show bias on [Debra R.'s] part.

"… I was unclear as to [Rafaela O.]. Now, she was the one that had the stabbed relative, and she felt he might have deserved it. I'm not sure how that bias is [*sic*] the -- the defense in this case.

"As to [Doris O.], I believe she had indicated she mostly dealt with the younger groups of children; that she had, in the past, done some junior high. I believe when she indicated that's when they mostly got into --

30.

started being approached by the gangs and that becoming a problem. But she no longer -- but she dealt mostly with the young people. She may have indicated there was -- they had started to be influenced by gangs in the later years, but, again, just because she lives in Wasco, may have, and teaches in school, I'm not sure where the bias comes from. Just the fact that she knows about gangs in Wasco, just I think the statement by the District Attorney that he knows that there are gang problems in Wasco, I'm not sure that's sufficient cause to show that everybody from Wasco ought to be excluded.

"As to … [Rosa H.], the grandmother who felt that her grandchild was wrongly accused. Again, … since there was no discussion of how that might influence her, … I don't recall myself … [Rosa H.'s] perspective on it, since I guess we did discuss it with her and it didn't rise to a level of cause to excuse her.

"It seems to me there's really no indication of what that bias may be. It's at this point, I guess, just speculation of a potential bias. I'm not sure.

"But other than that, I have no further comments, Your Honor.

"THE COURT: Mr. Revelo [counsel for Rivas]?

"MR. REVELO: I believe that [Doris O.] said that she worked with children that were not high schoolers and not seventh, eighth grade. So I don't think … that's accurate.

"There was another individual, also female, that used to be a teacher and now is a stay-at-home momma, and she was the one that said she was working with seventh and eighth graders. That's my recollection. Maybe I'm wrong.

"As to [Debra R.], … trespass is such a diminimus [*sic*] offense … in making no indication that she was upset about it. I don't think that's a valid reason to throw someone out.

"And the issue of … tattoos, strangely surprising, given the fact that it is such a common occurrence nowadays. Almost everybody now I know has tattoos. A lot of people came in with jurors that had tattoos. So … I can't really understand that.

"So with that, I submit.

"THE COURT: All right. The Court will note that there are four Hispanics on the panel now. Mr. Louie has accepted the panel five times.

31.

"Regarding the jurors, the Judge has evaluated Mr. Louie's explanation. I am satisfied with each explanation and finding the explanations sincere and genuine, and the motion is denied at this point.

"The Court is aware of the fact that Mr. Louie [the prosecutor] has bumped almost all of his peremptory challenges used on women. [*Sic*.]

"Four of those on Hispanic females. The Court is satisfied as to the record given by Mr. Louie as to [Rosa H., Debra R., Rafaela O., and Doris O.], those are the Hispanic females, as well as [Aida S. and Linda B.], who appeared to be Anglo females.

"The Court finds a valid reason for each one. [¶] … [¶]

"MR. LOUIE: Judge, could I also note for the record that there are … at least four females remaining on the panel, which I have accepted.

"THE COURT: Right.

"And I'd also like the record to reflect that the defense has bumped two Hispanic females of their 12. Joint peremptory challenges."

Coronado now says the prosecutor's explanation for excusing Doris O. failed to satisfy *Batson/Wheeler* requirements. He claims the prosecutor's stated reasons were based on his personal stereotyped views of Wasco having a prevalent Hispanic gang population, especially in the seventh and eighth grade age group — a legally impermissible racial stereotype — rather than the prospective juror's individual characteristics, and that Doris O's statement that seventh and eighth graders were involved in Hispanic gang activity was contrary to the record and therefore pretextual.

### *Analysis*

<u>Step One</u>

In step one of the *Batson/Wheeler* analysis the trial court found the defense had made a prima facie case of discrimination with respect to women. Women are a cognizable group (*People v. Panah* (2005) 35 Cal.4th 395, 438; see *J.E.B. v. Alabama ex rel. T.B.* (1994) 511 U.S. 127, 129, 130-131), as are (the California Supreme Court has assumed) Hispanic-surnamed women (*People v. Garceau* (1993) 6 Cal.4th 140, 171,

32.

disapproved on another ground in *People v. Yeoman* (2003) 31 Cal.4th 93, 117-118). A defendant and prospective juror alleged to have been wrongly excused need not be members of the same group in order for the defendant to complain. (*Powers v. Ohio* (1991) 499 U.S. 400, 416.) As we assume substantial evidence supports the court's determination (see *People v. Silva* (2001) 25 Cal.4th 345, 384 (*Silva*); *People v. Alvarez* (1996) 14 Cal.4th 155, 197), we move to step two.

Step Two

At step two, the prosecutor must come forward with a group-neutral explanation for each challenged excusal. (*Silva*, *supra*, 25 Cal.4th at p. 384.) "In evaluating the race [or gender] neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law.… [¶] A neutral explanation in the context of our analysis here means an explanation based on something other than the race [or gender] of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race [or gender] neutral." (*Hernandez v. New York* (1991) 500 U.S. 352, 359-360 (plur. opn. of Kennedy, J.).) At this step, the explanation need not be persuasive, or even plausible. (*Purkett v. Elem* (1995) 514 U.S. 765, 767-768.)

Whether the prosecutor has offered a group-neutral reason for his or her challenges is a question of law subject to our independent review. (*People v. Alvarez, supra,* 14 Cal.4th at p. 198, fn. 9; *Paulino v. Harrison* (9th Cir. 2008) 542 F.3d 692, 699.) Assuming the prosecutor's stated reasons for excusing Doris O. were true, his challenge to her did not violate the equal protection as a matter of law. Although the prosecutor referred specifically to *Hispanic* gangs, we do not find that to be indicative of an inherent discriminatory intent, given that he expected the evidence to show Hispanic gangs were involved in the case being tried.

33.

Citing *U.S. v. Bishop* (9th Cir. 1992) 959 F.2d 820, overruled on another ground in *U.S. v. Nevils* (9th Cir. 2010) 598 F.3d 1158, 1167, Coronado appears to contend the prosecutor's use of residence with respect to Doris O. was a pretext for race. *Bishop* is neither controlling nor apposite (see *People v. Williams* (1997) 16 Cal.4th 153, 190-191), and the extent to which it is still viable, in light of *Purkett v. Elem*, *supra*, 514 U.S. 765, is suspect (see *Boyde v. Brown* (9th Cir. 2005) 404 F.3d 1159, 1171, fn. 10). In any event, in *Bishop* the prosecutor explained his challenge of an African-American prospective juror as based in part on the fact the prospective juror lived in a predominantly low-income African-American neighborhood and accordingly was likely to believe police "'pick on black people.'" (*Bishop*, *supra*, 959 F.2d at p. 821.) Such was not the use to which the prosecutor in the present case put Doris O.'s employment — not residence — in Wasco. Moreover, while finding the excuse before it did not constitute a race-neutral explanation for the strike (*id*. at pp. 821-822), *Bishop* stated: "This is not to say that residence *never* can constitute a legitimate reason for excluding a juror .… On the contrary: What matters is not *whether* but *how* residence is used. Where residence is utilized as a link connecting a specific juror to the facts of the case, a prosecutor's explanation based on residence could rebut the prima facie showing." (*Id*. at p. 826.) The prosecutor here did not run afoul of *Bishop*.

Step Three

Accordingly, we move to step three. At this stage of the analysis, the trial court must decide whether the opponent of the peremptory strike(s) has proved *purposeful discrimination* by a preponderance of the evidence. (*Purkett v. Elem, supra,* 514 U.S. at p. 767; *People v. Hutchins* (2007) 147 Cal.App.4th 992, 997-998.) The persuasiveness of the proffered justification now becomes relevant (*Johnson v. California*, *supra*, 545 U.S. at p. 171), as implausible or fantastic justifications will be found to be pretexts for purposeful discrimination (*Purkett v. Elem, supra,* 514 U.S. at p. 768). "What is required

34.

are reasonably specific and neutral explanations that are related to the particular case being tried." (*People v. Johnson* (1989) 47 Cal.3d 1194, 1218.)

Once the prosecutor comes forward with such an explanation, the trial court must satisfy itself that the explanation is genuine. (*People v. Hall* (1983) 35 Cal.3d 161, 167.) "In [this] process, the trial court must determine not only that a valid reason existed but also that the reason actually prompted the prosecutor's exercise of the particular peremptory challenge." (*People v. Fuentes* (1991) 54 Cal.3d 707, 720.) "This demands of the trial judge a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case as then known, his knowledge of trial techniques, and his observations of the manner in which the prosecutor has examined members of the venire and has exercised challenges for cause or peremptorily, for 'we rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination.' [Citation.]" (*People v. Hall, supra,* 35 Cal.3d at pp. 167-168; see also *People v. Lomax* (2010) 49 Cal.4th 530, 570-571.) "'[T]he rule in *Batson* provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it.' [Citation.]" (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1320-1321.)

"When a trial court has made a sincere and reasoned effort to evaluate each of the stated reasons for a challenge to a particular juror, we accord great deference to its ruling, reviewing it under the substantial evidence standard. [Citations.]" (*People v. Jurado* (2006) 38 Cal.4th 72, 104-105; accord, *People v. Lenix* (2008) 44 Cal.4th 602, 627; see *Batson*, *supra*, 476 U.S. at p. 98, fn. 21; *Paulino v. Harrison, supra,* 542 F.3d at p. 699.) Deference does not, of course, "imply abandonment or abdication of judicial review." (*Miller-El v. Cockrell* (2003) 537 U.S. 322, 340.)

Here, the prosecutor stated he excused Doris O. because she worked with seventh and eighth graders in Wasco; he knew Wasco to be an area with Hispanic gang

35.

populations especially at that age group; and that Doris O. mentioned something about seventh and eighth graders being involved in that type of activity. In reality, although Doris O. said she had watched over seventh or eighth grade children in the past, she currently supervised kindergarten through sixth grade children. She was never asked, nor did she say anything, about gangs or gang activity, let alone seventh and eighth graders or children being involved in that type of activity. Thus the prosecutor's stated reasons were, in part, unsupported by the record.[23]

But further review of the record supports the conclusion that the prosecutor, counsel for Torres and the trial court confused a portion of the prosecutor's statements attributed to Doris O., with statements made by Primavera B., another prospective juror questioned after Doris O. Primavera B. stated she had worked with seventh and eighth grade students in the area and that they were subject to gang influence. When first questioned by the trial court outside the presence of other prospective jurors, Primavera B. stated that she was reading a book entitled "The God Delusion." She was then questioned about an answer on her jury questionnaire in which she answered yes to the

---

[23]    The Attorney General asserts there is no way to know whether Doris O.'s confidential questionnaire would have supported the prosecutor's stated reasons, since only the questionnaires from the seated panel and alternates were preserved. It is true that the record on appeal does not contain Doris O.'s questionnaire, which, as we have stated, asked, inter alia, whether the prospective jurors or someone close to him or her had been the victim of gang violence or accused of being in a gang, or whether the prospective juror had witnessed or investigated a gang crime. With respect to the panel of 80 prospective jurors of which Doris O. was a part, however, the trial court stated that 44 answered "yes" to one or more of the questions, while 36 answered "no." The court explained that those who answered "yes" would be spoken to privately and individually, while those who answered "no" would not be. It then excused the 36 who answered "no" and ordered them to return the following morning at 9:00, and read the names of those who were released for the day because they were not going to be questioned individually. Doris O.'s name was one of those read. We thus know she gave negative answers to all the questions contained in the questionnaire, and so can confidently surmise that nothing about her questionnaire would have supported the prosecutor's stated reasons for excusing her.

question of whether she had ever witnessed or investigated a gang crime. According to Primavera B., she was in downtown Bakersfield several years earlier and was about a half block from where a homicide occurred. She saw gunfire, but not the actual shooting, and did not know what had happened in the case, other than what she had read in the newspaper. Primavera B. thought it was a gang crime from "what they were wearing as they ran past me" and that the men were "[p]robably Hispanic or white."

Primavera B. then said she would have "a bit of a hard time" being unbiased in the present case, "[n]ot because of that incident, but because I work with children and I see a lot of the gang-life influence." Primavera B. taught for a few years on the east side of Bakersfield before becoming a stay-at-home mom. According to Primavera B., the gangs targeted "good kids … that have a future … [and] … took their futures away." Primavera B. stated that the "Junior High. Seventh grade. Eighth grade" kids would "come at the beginning of the school year really excited about learning, and then they just kind of go downhill." When questioned by Coronado's counsel, Primavera B. stated that she had a "really, really negative view of gangs" and that gangs "are nothing but criminal activity." Rivas counsel continued the questioning and Primavera B. explained that she grew up in Delano where there was a lot of gang activity, especially in junior high. When questioned by the prosecutor, Primavera B. stated that she thought she would be able to consider only the evidence and follow the law. The trial court then again questioned her and, after explaining the burden of proof, asked if she could be fair and impartial. She said the thought she could.

After telling Primavera B. to return the following morning, counsel for Torres stated that the court had not offered him an opportunity to challenge her and that he wanted the record to reflect that he would challenge her for cause. Both counsel for Coronado and Rivas joined in the request. The prosecutor objected to the challenge for cause stating that "everyone in the community doesn't like gangs," and he thought Primavera B. was articulating that, but that she had said she could consider only the

evidence and follow the law.  The trial court stated that it would consider a case cited by Coronado's counsel and would revisit the issue the following morning.  The trial court then addressed Torres' counsel and stated that it was somewhat confused because counsel had first implied "we were getting rid of people who knew something about gangs too quickly … and I kept that in mind with [Primavera B.], and now you kind of say … maybe we kept her too long."  The following morning, Primavera B. was removed for cause.

Coronado, and the dissent, rely on *Silva*, *supra*, 25 Cal.4th 345, in which the California Supreme Court confronted a situation in which the prosecutor misrepresented the record.  During an ex parte hearing, the prosecutor said he challenged prospective juror M. during the death qualification voir dire because M. indicated he "'would look for other options'" to the death penalty and described M. as "'an extremely aggressive person and might hang the jury .…'" (*Id.* at p. 376.)  But the *Silva* court found that the transcript of the death-qualification voir dire "provides no support for either of these reasons."  (*Id.* at p. 377.)  The *Silva* court found that,

> "when the prosecutor gave reasons that misrepresented the record of voir dire, the trial court erred in failing to point out inconsistencies and to ask probing questions.  'The trial court has a duty to determine the credibility of the prosecutor's proffered explanations' (*McClain v. Prunty* (9th Cir. 2000) 217 F.3d 1209, 1220), and it should be suspicious when presented with reasons that are unsupported or otherwise implausible (see *Purkett v. Elem, supra,* 514 U.S. 765, 768 [stating that at step three 'implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination']; *McClain v. Prunty*, *supra*, at p. 1221 ['Where the facts in the record are objectively contrary to the prosecutor's statements, serious questions about the legitimacy of a prosecutor's reasons for exercising peremptory challenges are raised.']).

> " … Although an isolated mistake or misstatement that the trial court recognizes as such is generally insufficient to demonstrate discriminatory intent [citation], it is another matter altogether when, as here, the record of voir dire provides no support for the prosecutor's stated reasons for exercising a peremptory challenge and the trial court has failed to probe the

issue [citations]. We find nothing in the trial court's remarks indicating it was aware of, or attached any significance to, the obvious gap between the prosecutor's claimed reasons for exercising a peremptory challenge against M. and the facts as disclosed by the transcripts of M.'s voir dire responses. On this record, we are unable to conclude that the trial court met its obligations to make 'a sincere and reasoned attempt to evaluate the prosecutor's explanation' [citation] and to clearly express its findings [citation]." (*Silva, supra,* 25 Cal.4th at p. 385.)

The *Silva* court concluded that,

"the trial court's ultimate determination — that defendant failed to meet his burden of proving intentional discrimination with respect to the prosecutor's peremptory challenge of Prospective Juror M. — is unreasonable in light of the evidence of the voir dire proceedings. Although we generally 'accord great deference to the trial court's ruling that a particular reason is genuine,' we do so only when the trial court has made a sincere and reasoned attempt to evaluate each stated reason as applied to each challenged juror. [Citations.] When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings. But when the prosecutor's stated reasons are either unsupported by the record, inherently implausible, or both, more is required of the trial court than a global finding that the reasons appear sufficient. As to Prospective Juror M., *both of the prosecutor's stated reasons were factually unsupported by the record.* Because the trial court's ultimate finding is unsupported — at least as to Prospective Juror M. — we conclude that defendant was denied the right to a fair penalty trial in violation of the equal protection clause of the federal Constitution [citation] and was denied his right under the state Constitution to a trial by a jury drawn from a representative cross-section of the community [citation]." (emphasis added.) (*Silva, supra,* 25 Cal.4th at pp. 385-386.)

In contrast, other cases have recognized that what Coronado here refers to as a misrepresentation on the part of the prosecutor might be an "honest mistake of fact" and does not necessarily demonstrate impermissible group bias. (*People v. Jones* (2011) 51 Cal.4th 346, 366 (*Jones*); see also *People v. Elliott* (2012) 53 Cal.4th 535, 565.) "The purpose of a hearing on a *Wheeler*/*Batson* motion is not to test the prosecutor's memory but to determine whether the reasons given are genuine and [group] neutral. 'Faulty memory, clerical errors, and similar conditions that might engender a "mistake" … are

not necessarily associated with impermissible reliance on presumed group bias.' [Citation.] [An] 'isolated mistake or misstatement' [citation] does not alone compel the conclusion that [a] reason was not sincere." (*People v. Jones*, *supra*, at p. 366.)

The record reflects that the prosecutor's recollection and stated reasons for challenging the other six jurors were accurate, after five days of voir dire and an intervening weekend, and non-discriminatory. The record also reflects that the prosecutor's statement that Doris O. worked with seventh and eighth graders was generally accurate, since she said she had worked with that age group in the past. Also, the fact that he knew Wasco to be an area with an Hispanic gang population is entirely plausible based on his experience as a deputy district attorney in Kern County.

Finally, as clearly supported by the record, the prosecutor was confused when he said Doris O. mentioned something about seventh and eighth graders being involved in gang activity. As outlined above, another juror, Primavera B., stated she worked with seventh and eighth graders and they were subject to gang influences. Counsel for Torres made a similar mistake and attributed these same comments to Doris O. Counsel for Coronado, who is solely challenging the dismissal of Doris O. in this appeal, asked no questions. Only counsel for Rivas pointed out that the prosecutor's references to seventh and eighth grader's was attributed to Primavera B., not Doris O. However, he failed to mention the prosecutor's mistaken reference to Hispanic gang activity.

It is important to recognize a distinguishing fact between *Silva* and this case: Nothing in the record supported the prosecutor's offered explanations for disqualifying the *Silva* juror, whereas in this case, one of the prosecutor's reasons was race neutral while the second reason was unsupported by the record, based on apparent mistake.

In P*eople v. Williams, supra,* 16 Cal.4th 153 (for our purposes, *Williams I*), a *Batson/Wheeler* motion challenged the excusal of a juror whom the prosecutor stated he had excused "'in error.'" Referring to his notes, the prosecutor explained that he got the

prospective juror "'confused'" and made a "'flat out mistake.'" (*Id.* at p. 188.) Our Supreme Court found no violation of *Batson/Wheeler*, stating:

> "First, a 'mistake' is, at the very least, a 'reason,' that is, a coherent explanation for the peremptory challenge. It is self-evidently possible for counsel to err when exercising peremptory challenges. Second, a genuine 'mistake' is a race-neutral reason. Faulty memory, clerical errors, and similar conditions that might engender a 'mistake of the type the prosecutor proffered to explain his peremptory challenge are not necessarily associated with impermissible reliance on presumed group bias. [Citations.] Third, a 'mistake' may be a reason based on 'specific bias' [citation] where, as appears to have been the case here, the prosecutor's error is one of erroneously *believing*, owing to clerical error, that a prospective juror had earlier been evaluated as specifically biased, when in fact she had not. Finally, a 'mistake' is a reason 'related to the particular case to be tried' [citation] to the extent the *possibility* that genuine errors of this sort will be made exists in every case." (*Id.* at pp. 188-189.)

The *Williams I* court stated further that, while there was always the possibility that counsel called upon to explain a questionable peremptory challenge will "take refuge in a disingenuous claim the challenge was mistakenly made[, …] [w]e give great deference to the trial court's determination that the use of peremptory challenges was not for an improper or class bias purpose. (*Williams I, supra,* 16 Cal.4th at p. 189.)

In *People v. Phillips* (2007) 147 Cal.App.4th 810, 814 (*Phillips*), the prosecutor gave a reason for excusing a juror, which the prosecutor later discovered and informed the court was mistakenly based on information in the questionnaire of another juror with the same last name. Again, the court found no violation of *Batson/Wheeler*. The prosecutor fully explained the source of her mistake, and because it involved jury questionnaires and prospective jurors with the same surnames, the error was subject to objective verification. Moreover, the prosecutor brought her mistake to the court's attention even though the court had already ruled in her favor, lending support to the conclusion that the mistake was genuine. (*Phillips, supra,* at p. 819.)

41.

In *Jones, supra,* 51 Cal.4th 346, the defendant made a *Batson/Wheeler* motion to the peremptory challenge to three African-American prospective jurors. The prosecutor explained, as to prospective juror N.C., that he was concerned with an answer on N.C.'s questionnaire to the question whether he or a close friend or family member had been accused of a crime. N.C. wrote that his son had been so accused. The prosecutor stated that he thought the crime was attempted murder or murder. In fact, N.C. had stated on the questionnaire only that his son had been accused of a crime and that it went to trial. He left blank questions regarding what the crime was and what had happened. (*Jones, supra,* at p. 358.) The prosecutor also explained that he was concerned with N.C.'s body language in response to several questions. When asked by the trial court whether the prosecutor's primary concern was that N.C. had a family member charged with a serious crime, the prosecutor responded that the "'conjunction'" of these factors "'pushed [N.C.] over on the scale.'" (*Ibid.*) The trial court found the prosecutor's peremptory challenge to N.C. and two other prospective jurors to be for nonracial and racially neutral purposes. (*Id.* at p. 359.)

On appeal, the defendant in *Jones* relied on *Silva* stating that the Supreme Court should not defer to the trial court's ruling because it simply denied the motion without making a "sincere and reasoned attempt to evaluate the prosecutor's credibility." (*Jones, supra,* 51 Cal.4th at p. 361.) Our Supreme Court disagreed, stating that the court denied the motion "'only after observing the relevant voir dire and listening to the prosecutor's reasons supporting each strike and to any defense argument supporting the motions. Nothing in the record suggests that the trial court either was unaware of its duty to evaluate the credibility of the prosecutor's reasons or that it failed to fulfill that duty.'" (*Ibid.*, citing *People v. Lewis* (2008) 43 Cal.4th 415, 471.) The court in *Jones* asked the prosecutor one question during his explanation. Defense counsel declined to comment when invited to, "thus suggesting he found the prosecutor credible." (*Jones, supra,* at p.

42.

361.*)* "Under the circumstances, the court was not required to do more than what it did." (*Ibid.*)

While the court in *Jones* found that the record did not support the prosecutor's statement that N.C.'s relative was accused of attempted murder or murder, it stated:

> "Although relevant, this circumstance is not dispositive. No reason appears to assume the prosecutor intentionally misstated the matter. He might have based what he thought on information he obtained outside the record. Or he may simply have misremembered the record. The prosecutor had to keep track of dozens of prospective jurors, thousands of pages of jury questionnaires, and several days of jury voir dire, and then he had to make his challenges in the heat of trial. He did not have the luxury of being able to doublecheck all the facts that appellate attorneys and reviewing courts have. Under the circumstances, it is quite plausible that he simply made an honest mistake of fact. Such a mistake would not show racial bias, especially given that an accurate statement (that N.C. wrote that his son had been accused of, and tried for, a crime but left the rest of the answer blank) would also have provided a race-neutral reason for the challenge." (*Jones, supra,* 51 Cal.4th at p. 366.)

"The purpose of a hearing on a *Wheeler/Batson* motion is not to test the prosecutor's memory but to determine whether the reasons given are genuine and race neutral." (*Id.* at p. 366.) The "'isolated mistake or misstatement'" in *Jones* did not compel a conclusion that the reason given was not sincere. (*Ibid.*)

In the very recent case of *People v. Williams* (2013) 56 Cal.4th 630 (for our purposes *Williams II*), the trial court denied defense counsel's three separate *Batson/Wheeler* motions in connection with the prosecutor's use of peremptory challenges against five African-American women prospective jurors. The prosecutor's explanation of one challenge, to prospective juror R.J., was based on his impression that R.J. would be unable to impose the death penalty because of her answers and the demeanor and fashion in which she answered his questions. The trial court stated that it did not recall the responses of this prospective juror. (*Williams II, supra,* at p. 658.) The

*Williams II* court found the peremptory challenge to R.J. to be race-neutral.  (*Id.* at p. 659.)

R.J.'s written questionnaire generally expressed support for the death penalty, but contained qualifying language that could be interpreted as showing equivocation or hesitation.   But the *Williams II* court found that the record also "presents the possibility that the prosecutor mistook R.J. for another prospective juror, D.J., also an African-American woman, who happened to have the same last name."  (*Williams II., supra,* 56 Cal.4th at p. 659.)

After defendant's conviction, defense counsel brought a motion for new trial, the central claim of which was ineffective assistance of counsel, but which also included a claim of *Batson/Wheeler* error.  In the hearing on the *Batson/Wheeler* portion of the new trial motion, the prosecutor incorporated all the statements he made during the *Batson/Wheeler* motion and then provided a chronological narrative of the 16 peremptory challenges he had used, providing the name and a description of each of the prospective jurors he excused.  In part, he described his 14th the challenge as being to D.J., "'a married 39-year-old Black female,'" which is borne out by her jury questionnaire.  No mention was made at this point to R.J., who according to her jury questionnaire was "remarried" and 65 years old.  And when the prosecutor then discussed the five prospective jurors who were subjects of his *Batson/Wheeler* motions, he erroneously named D.J. as the fifth African-American woman he excused, not R.J., and stated that he noted her opposition on the questionnaire to the death penalty, which is supported by the record.  At the new trial motion hearing, the apparent discrepancy between the prosecutor's discussion of D.J. as the fifth African-American woman juror excused rather than R.J., as listed in the reporter's transcript, was not raised by defense counsel or commented on by the trial court.  (*Williams II, supra,* 56 Cal.4th at p. 660.)

The *Williams II* court stated that, unlike *Williams I, supra,* 16 Cal.4th 153 and *Phillips, supra,* 147 Cal.App.4th 810, the court and parties in *Williams II* were never

made aware of the prosecutor's possible error in excusing the prospective juror. "This difference, however, does not in itself affect the determination whether the prosecutor's excusal was based on a race-neutral reason. The information disclosed at the new trial motion hearing strongly supports the race-neutral reason the prosecutor gave at the time of the motion – hesitancy to impose the death penalty. Therefore, assuming that the prosecutor mistakenly excused R.J. because he thought she was D.J., there was no violation of *Batson/Wheeler*." (*Williams II, supra,* 56 Cal.4th at p. 661.)

Here, unlike *Silva* and more akin to *Williams I*, *Phillips, Jones*, and *Williams II*, we find that the prosecutor made an isolated mistake or misstatement. The prosecutor struck Doris O. because, according to him, she currently worked with seventh and eighth graders in Wasco, an area that he knew had a gang population especially in that age group, and that Doris O. had mentioned that. The record shows that, although Doris O. previously worked with seventh and eighth graders, she currently worked with younger students; she made no statements about gang activity. When invited to comment, Coronado's counsel declined, "thus suggesting he found the prosecutor credible." (*Jones, supra,* 51 Cal.4th at p. 361.) The mistake made by the prosecutor was repeated by Torres' counsel, who clarified that although Doris O. currently worked with "younger groups of children," she had in the past "done some junior high" and "she indicated that's when they mostly got into – started being approached by the gangs and that becoming a problem." Rivas' counsel stated that he believed Doris O. worked with children that were not high schoolers or seventh and eighth graders, and he alluded to Primavera B., stating, "another individual, also female, that used to be a teacher and now is a stay-at home momma, and she was the one that said she was working with seventh and eighth graders. That's my recollection. Maybe I'm wrong." But he made no mention of Doris O.'s statement about gang involvement.

The prosecutor explained that his peremptory challenge as to Doris O. was based on his impression that she had worked with seventh and eighth graders in Wasco, an area

45.

that has a gang population, "especially at that age group." As we discussed earlier, this statement, if true, supports a race-neutral reason on the part of the prosecutor for challenging Doris O. - given that he expected the evidence to show Hispanic gangs were involved in the case being tried. The record, however, supports the likelihood that the prosecutor mistook Doris O. for another prospective juror, Primavera B.[24] There is nothing in the record to support any inference that the prosecutor intentionally misstated anything he said supporting his reason for disqualifying Doris O. Like the prosecutor in *Jones*, he had to keep track of dozens of jurors, many pages of juror questionnaires, five days of voir dire, and then respond to an oral *Batson/Wheeler* motion. Again, like *Jones*, "[u]nder the circumstances, it is quite plausible that he simply made an honest mistake of fact. Such a mistake would not show racial bias …." (*Jones, supra*, 51 Cal.4th at p. 366.)

Finally, there is nothing in the record to indicate that the trial court did not undertake "a sincere and reasoned attempt to evaluate" each of the stated reasons for the challenge to Doris O. (*People v. Hall, supra,* 35 Cal.3d at p. 167.) "Based on our review of the entire record, we conclude that this act of mistaken identity is the most probable explanation of the events disclosed in the record and that there was no violation of *Batson/Wheeler*." (*Williams II, supra,* 56 Cal.4th at p. 659.)

III. CALCRIM No. 600

Defendants were charged with a single count of attempted murder. René Serrano was the named victim. The evidence adduced at trial showed that only one shot was fired. Although there were a number of people in the area when the shot was fired,

---

[24] We note also that the topic of God was part of the questioning of both Doris O. (when asking by Rivas's counsel if she believed she was "a god" and counsel then equated a "beyond all doubt" standard with God) and Primavera B. (when she stated she was reading a book entitled "The God Delusion"). These referenced to God may have added to the confusion between these two prospective jurors.

Coronado did not fire indiscriminately, but rather pointed the gun directly at René and fired a single shot into his midsection.

The trial court instructed the jury on attempted murder in the language of CALCRIM No. 600, to wit:

> "Defendant[s] … are charged in Count 1 with attempted murder.
>
> "To prove the defendants guilty of attempted murder, the People must prove that, one, the defendant took at least one direct, but ineffective step towards the killing of another person; and, two, the defendant intended to kill that person.  [¶] … [¶]
>
> *"A person may intend to kill a specific victim or victims and at the same time intend to kill anyone in a particular zone of harm or kill zone.*
>
> *"In order to convict the defendant of attempted murder of René Serrano, the People must prove that the defendant intended to kill René Serrano or intended to kill anyone within the kill zone.*
>
> *"If you have a reasonable doubt whether the defendant intended to kill René Serrano or intended to kill another by harming everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of René Serrano."*  (Italics added.)

We agree with Coronado that the trial evidence did not support the giving of the emphasized portion of CALCRIM No. 600.

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing."  (*People v. Lee* (2003) 31 Cal.4th 613, 623.)  The doctrine of transferred intent does not apply to the crime of attempted murder.  (*People v. Bland* (2002) 28 Cal.4th 313, 317.)  "A person who intends to kill only one is guilty of the attempted (or completed) murder of that one but not also of the attempted murder of others the person did not intend to kill."  (*Ibid.*)

The kill zone theory "addresses the question of whether a defendant charged with the murder or attempted murder of an intended target can *also* be convicted of attempting to murder other, nontargeted, persons."  (*People v. Stone* (2009) 46 Cal.4th 131, 138

47.

(*Stone*).)  Despite the inapplicability of the doctrine of transferred intent, a person who shoots at a group of people may be found guilty of the attempted murder of everyone in the group, even if he or she primarily targeted only one of them, if the person also, concurrently, intended to kill others within what has been termed the "'kill zone.'" (*People v. Bland, supra,* 28 Cal.4th at p. 329.)  "'The intent is concurrent … when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity.'" (*Ibid.*)

"'Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone.'" (*People v. Bland*, *supra*, 28 Cal.4th at p. 330; see *People v. Vang* (2001) 87 Cal.App.4th 554, 563-564.)  Thus, "a shooter may be convicted of multiple counts of attempted murder on a 'kill zone' theory where the evidence establishes that the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim … as the means of accomplishing the killing of that victim." (*People v. Smith* (2005) 37 Cal.4th 733, 745-746.)

Here, Coronado was charged with only a single count of attempted murder.  He was not charged with attempting to murder persons in the vicinity of his intended target — René — and he did not use a means of force calculated to kill everyone in the group. Under these circumstances, the kill zone theory was inapplicable, and the jury should not have been instructed thereon.  (*People v. Perez* (2010) 50 Cal.4th 222, 224-225; *Stone*, *supra*, 46 Cal.4th at p. 138.)[25]

---

[25]    Since the "concurrent intent [kill zone] theory is not a legal doctrine requiring special jury instructions," but rather "is simply a reasonable inference the jury may draw in a given case" (*People v. Bland, supra,* 28 Cal.4th at p. 331, fn. 6), an instruction thereon is not required (*Stone, supra,* 46 Cal.4th at pp. 137-138).  It is therefore questionable whether a trial court can ever err by declining to give such an instruction. (See *People v. McCloud* (2012) 211 Cal.App.4th 788, 802-803.)

We next must determine whether the error in instructing the jury regarding the kill zone theory of liability for attempted murder was prejudicial. (See *Stone, supra,* 46 Cal.4th at pp. 138-139 [error in giving kill zone theory instruction which did not fit facts of case not necessarily prejudicial].)

"It is error to give an instruction which, while correctly stating a principle of law, has no application to facts of the case." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) Such an error requires reversal only if "it is reasonably probable the result would have been more favorable to the defendant had the error not occurred. [Citation.]" (*Id.* at p. 1130.) "[G]iving an irrelevant or inapplicable instruction is generally '"only a technical error which does not constitute ground for reversal."' [Citation.]" (*People v. Cross* (2008) 45 Cal.4th 58, 67.) "In determining whether there was prejudice, the entire record should be examined, including the facts and the instructions, the arguments of counsel, any communications from the jury during deliberations, and the entire verdict. [Citation.] Furthermore, instruction on an unsupported theory is prejudicial only if that theory became the sole basis of the verdict of guilt; if the jury based its verdict on the valid ground, or on both the valid and the invalid ground, there would be no prejudice, for there would be a valid basis for the verdict.… [T]he appellate court should affirm the judgment unless a review of the entire record affirmatively demonstrates a reasonable probability that the jury in fact found the defendant guilty solely on the unsupported theory." (*People v. Guiton, supra,* 4 Cal.4th at p. 1130; accord *People v. Perez* (2005) 35 Cal.4th 1219, 1233.)

Here, the jury was properly instructed on the elements required to convict Coronado of attempted murder, included the non-italicized portion of CALCRIM No. 600, above, as well as CALCRIM No. 251, which instructed that, in order to find Coronado guilty of attempted murder "[h]e must not only intentionally commit the prohibited act, but must do so with a specific intent or mental state." The only count of attempted murder in the information charged Coronado with the attempted murder of

49.

René Serrano, and there was no argument from the prosecutor that Coronado intended to kill anyone other than René. At one point, the prosecutor, in arguing intent to kill, argued that Coronado shot René right "in the kill zone," referring to the vital portion of René's body: "[Coronado] pulled the trigger in the kill zone, and everyone knows that if you shoot someone right there, there's a good change they're going to die …." Although the argument was anatomically valid (see *People v. Houston* (2012) 54 Cal.4th 1186, 1218 [act of shooting firearm toward victim at close range in manner that could have inflicted mortal wound had shot been on target is sufficient to support inference of intent to kill]), the prosecutor would have done better to eschew use of the term "kill zone" in light of the wording of CALCRIM No. 600. "Kill zone," as utilized in CALCRIM No. 600, has nothing to do with the portion of the victim's body that was shot.

But the instructions, combined with the evidence and prosecutor's closing arguments, leave no doubt that the jury convicted Coronado for the attempted murder of René based on his intent to kill René, and not the "concurrent intent" or "kill zone" theory. In addition, the "kill zone" instruction did not undermine Coronado's defense that he was not the shooter or that, if he was, he shot René in self-defense or the act of defending another. And nothing in the record establishes the jury relied on the kill zone theory. Because there is no "affirmative indication in the record" that the jury based its verdict on the kill zone theory, the error in instructing on the kill zone theory is harmless. (*People v. Guiton, supra,* 4 Cal.4th at pp. 1128-1129.)

Coronado makes an additional argument that the kill zone theory language, as given in CALCRIM No. 600, was erroneous in that the instruction was disapproved by our Supreme Court in *Stone, supra,* 46 Cal.4th 131. He argues the instruction's ambiguous language permitted the jury to convict him of the attempted murder of René under a kill zone theory so long as the shooter intended to "harm" everyone in the kill zone.

In *Stone*, the Supreme Court noted the ambiguity in the CALCRIM No. 600 instruction's reference to the "intent to kill 'anyone' within the kill zone rather than 'everyone,'" and reference to an intent to "harm" rather than "kill" everyone in the kill zone. (*Stone, supra,* 46 Cal.4th at p. 138, fn. 3.) But the *Stone* court did not conclude these ambiguities rendered the CALCRIM No. 600 instruction erroneous. Instead, it noted, "[i]n context, a jury hearing about the intent to kill *anyone* within the kill zone would probably interpret it as meaning the intent to kill *any* person who happens to be in the kill zone, i.e., *everyone* in the kill zone." (*Stone, supra,* at p. 138, fn. 3.) And "[b]ecause the intent required for attempted murder is to kill rather than merely harm, it would be better for the instruction to use the word 'kill' consistently rather than the word 'harm.'" (*Ibid.*)[26] We reach the same conclusion regarding the instruction given here.

IV. PROSCECUTORIAL MISCONDUCT

Coronado contends the prosecutor engaged in misconduct in during rebuttal argument, resulting in a miscarriage of justice requiring reversal. Specifically, he claims the prosecutor committed misconduct by vouching for his witnesses and by appealing to the passions and prejudice of the jury. We disagree.

### Procedural Background

In closing, Mr. Revelo, counsel for Rivas, argued that there was a lack of sufficient evidence in this case to convict. At one point, he argued that, although at times "institutions are corrupted by people who think they are doing the right thing, we have to assume that what happened that night and the investigation that followed the shooting of René Serrano took the direction that it took not because they wanted to frame these three

---

[26]     Following *Stone, supra,* 46 Cal.4th 131 the CALCRIM No. 600 kill zone theory instruction was revised to substitute "everyone" for "anyone" and intent to "kill" for intent to "harm." (Judicial Council of Cal., Crim. Jury Instns. (2011) CALCRIM No. 600, p. 409.)

51.

men because they hated them, but simply because at some point it became sort of the only possible conclusion of what they were doing."

In response, in rebuttal argument, the prosecutor made the following statement:

"Ladies and gentlemen, in my rebuttal I can only address the things that the defense counsel brought up, and I only intend to address the major topics that each defense counsel has addressed. [¶] … [¶] [W]e heard a lot from Mr. Revelo [counsel for Rivas] about the People, the government. What the People, the District Attorney's Office, and law enforcement does is not try to frame and convict innocent people. What we do is we try to protect and serve our community to prevent gang crimes so that when we go to the Valley Plaza -"

At this point, counsel for Rivas objected on grounds that the prosecutor was vouching for his own witnesses. The trial court overruled the objection and the prosecutor then said:

"What the District Attorney's Office, who represents the People of the State of California, who represents the People in our community, along with law enforcement, what we do is not try to frame innocent people and steam roll and convict people who are not guilty. [¶] What we do is we try to protect and serve by investigating, prosecuting dangerous crimes, whether they're gang crimes or other types of crimes, so that people in our community feel safe, can go to the mall, can go to the movies, can live their lives."

### *Applicable Law and Analysis*

Improper remarks by a prosecutor can so infect the trial with unfairness as to make the resulting conviction a denial of due process. (*People v. Earp* (1999) 20 Cal.4th 826, 858; *Darden v. Wainwright* (1986) 477 U.S. 168, 181.) The defendant need only show the prosecutor's misconduct prejudiced his right to a fair trial, regardless of whether the misconduct was intentional or inadvertent. (*People v. Hill* (1998) 17 Cal.4th 800, 822.) "Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44.) When the claim focuses on comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood the

52.

jury construed or applied any complained-of remarks in an objectionable fashion. (*People v. Ayala* (2000) 23 Cal.4th 225, 283-284; *People v. Frye* (1998) 18 Cal.4th 894, 970, overruled on another ground in *People v. Doolin, supra,* 45 Cal.4th at p. 421, fn. 22.)

While a prosecutor may not misstate the law, a prosecutor is given wide latitude during argument. Prosecutorial argument may be vigorous, as long as it amounts to fair comment on the evidence, including reasonable inferences or deductions that may be drawn from that evidence. During closing argument, counsel may state matters that are not in evidence but that are common knowledge or illustrations drawn from common experience, history, or literature. (*People v. Hill, supra,* 17 Cal.4th at pp. 819, 829.)

A prosecutor is entitled to comment on the credibility of a witness based on evidence adduced at trial. (*People v. Thomas* (1992) 2 Cal.4th 489, 529.) Prosecutorial assurances regarding the honesty or reliability of a prosecution witness, supported in the record, do not constitute improper "'vouching.'" (*People v. Medina* (1995) 11 Cal.4th 694, 757.) But a prosecutor may not suggest he or she has information undisclosed to the jury bearing on the issue of credibility, veracity or guilt. The danger in such remarks is jurors will believe that some inculpatory evidence, known only to the prosecution, has been withheld from them. (*People v. Green* (1980) 27 Cal.3d 1, 35; *People v. Padilla* (1995) 11 Cal.4th 891, 945-946, overruled on another ground in *People v. Hill, supra,* 17 Cal.4th at p. 823, fn. 1.) Impermissible vouching occurs "where the prosecutor places the prestige of the government behind a witness through personal assurances of the witness's veracity or suggests that information not presented to the jury supports the witness's testimony." (*People v. Fierro* (1991) 1 Cal.4th 173, 211.)

It is also misconduct for a prosecutor to appeal to the passions and prejudice of the jury. (*People v. Mayfield* (1997) 14 Cal.4th 668, 803.) An appeal to the passions and prejudice of the jury is an appeal that is wholly irrelevant to any facts or issues in the case. (*Viereck v. U.S.* (1943) 318 U.S. 236, 247.)

The defendant has the burden of showing the existence of prosecutorial misconduct.  Whether prosecutorial misconduct warrants a mistrial is a determination within the sound discretion of the trial court.  (*People v. Price* (1991) 1 Cal.4th 324, 430.)

In *People v. Alvarado* (2006) 141 Cal.App.4th 1577 (*Alvarado*), on which Coronado relies, the prosecutor committed misconduct by vouching for witnesses when she began her rebuttal by saying, " … '*I have a duty and I have taken an oath as a deputy District Attorney not to prosecute a case if I have any doubt that that crime occurred.*  [¶] *The defendant charged is the person who did it.*  To insinuate, suggest, or to say outright that I would risk my job, my profession, multiple police officers – I think one detective was on what, 33 years, another one was 27, another one just starting his career – to suggest that any of us would put our professional career on the line because this thug took some kid's bike is offensive and it is preposterous.'" (*Id.* at p. 1583, original italics.) The court found misconduct even after considering that the comments may have been in response to defense counsel's argument.  (*Id.* at p. 1584.)

Here, the prosecutor was attempting to counter defense counsel's inference that the defendants were framed by a corrupt system of government.   In doing so, the prosecutor, unlike the prosecutor in *Alvarado*, did not personally vouch for anyone in the government, stating only that "what the People, the District Attorney's Office, and law enforcement does is not try to frame and convict innocent people" and "not try to … steam roll and convict people who are not guilty."

Nor do we find the prosecutor's statements were aimed at inciting the passions and prejudices of the jury when he stated that, what "we do", i.e., "the People, the District Attorney's Office, and law enforcement," is to "protect and serve by investigating, prosecuting dangerous crimes, whether they're gang crimes or other types of crimes, so that people in our community feel safe, can go to the mall, can go to the movies, can live their lives."

Coronado compares this to the circumstances in *United States v. Weatherspoon* (9th Cir. 2005) 410 F.3d 1142, 1149 (*Weatherspoon*). He suggests the prosecutor by these comments, in essence, urged the jury to protect community values and deter future law breaking, thus diverting the jury from its role of objectively evaluating the facts and evidence.

But we find the facts of *Weatherspoon* distinguishable. In that case, the prosecutor repeatedly, in the face of the court's admonitions, urged the jury to convict the defendant in order to protect other individuals in the community. (*Weatherspoon, supra,* 410 F.3d at pp. 1149-1150.) The *Weatherspoon* court found the prosecutor's statements were "clearly designed to encourage the jury to enter a verdict on the basis of emotion rather than fact." (*Id.* at p. 1150.) Here, as noted earlier, the prosecutor, in rebuttal, was merely attempting to explain the role of the government and law enforcement to counter defense counsel's inference that the defendants were unjustly framed by a corrupt system of government. He was not urging a conviction based on the premise that, in doing so, the jury was protecting others or themselves in the community.

In any event, there is no reasonable likelihood the jury construed or applied the prosecutor's remarks in an objectionable fashion. (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.) The evidence against Coronado was strong. (See *Weatherspoon, supra,* 410 F.3d at p. 1151 [when case is strong, likelihood that prosecutorial misconduct will affect defendant's substantial rights is lessened].) The prosecutor's rebuttal argument did not render Coronado's trial fundamentally unfair nor did it involve the use of deceptive or reprehensible methods to attempt to persuade the jury. (*People v. Ayala, supra,* 23 Cal.4th at pp. 283-284.) Accordingly, the prosecutor's remarks did not amount to prejudicial misconduct warranting reversal. (*People v. Ervin* (2000) 22 Cal.4th 48, 101.)

## V. SEVERANCE AND BIFURCATION OF GANG ISSUES

Coronado contends next that the trial court abused its discretion and violated his right to due process when it denied his motion to sever the gang participation count and

55.

bifurcate the gang enhancement allegations from the remaining charges.  We find no abuse of discretion or due process violation.

Prior to trial, Coronado moved to sever the trial of the gang participation count and to bifurcate the gang enhancement allegations, contending that allowing such evidence would prejudice his right to a fair trial on the remaining counts due to the prejudicial nature of gang evidence.  After a hearing on the issue, the trial court denied the motion.

Section 954 permits the joinder of "two or more different offenses connected together in their commission, … or two or more different offenses of the same class of crimes or offenses."  The law favors joinder of counts because it promotes efficiency. (*People v. Myles* (2012) 53 Cal.4th 1181, 1200.)  Even when joinder is proper, the trial court may, "in the interests of justice and for good cause shown," exercise its discretion to order that different offenses or counts be tried separately.  (§ 954; see *People v. Thomas* (2012) 53 Cal.4th 771, 798.)  "'"'The burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried." [Citation.]'"  (*People v. Bradford* (1997) 15 Cal.4th 1229, 1315.)

If the trial court denies a motion to sever, the ruling is reviewed on appeal for abuse of discretion.  (*People v. Ramirez* (2006) 39 Cal.4th 398, 439.)  In determining whether a trial court abused its discretion, we consider the record before the trial court when it made it ruling.  (*People v. Thomas, supra,* 53 Cal.4th at p. 798.)  "We consider first whether the evidence of the two sets of offenses would have been cross-admissible if the offenses had been separately tried.  [Citation.]  If the evidence would have been cross-admissible, then joinder of the charges was not prejudicial."  (*Ibid.*)

If the evidence is not cross-admissible, "we next inquire 'whether the benefits of joinder were sufficiently substantial to outweigh the possible "spill-over" effect of the "other-crimes" evidence on the jury in its consideration of the evidence of [the] defendant's guilt of each set of offenses.'  [Citations.]  We consider '[1] whether some of

the charges are likely to unusually inflame the jury against the defendant; [2] whether a weak case has been joined with a strong case or another weak case so that the total evidence may alter the outcome of some or all of the charges; and [3] whether one of the charges is a capital offense, or the joinder of the charges converts the matter into a capital case.' [Citation.] 'We then balance the potential for prejudice to the defendant from a joint trial against the countervailing benefits to the state.' [Citation.]" (*People v. Thomas, supra,* 53 Cal.4th at pp. 798-799.)

Finally, even when a trial court's denial of severance was not an abuse of discretion at the time it was made, we must consider the evidence actually introduced at trial to determine whether the joinder resulted in a gross unfairness amounting to a denial of fair trial or due process. (*People v. Thomas, supra,* 53 Cal.4th at pp. 800-801; *People v. Myles, supra,* 53 Cal.4th at p. 1202.)

To convict Coronado of the gang participation count, the prosecution needed to prove, among other elements, that he "willfully promote[d], further[ed], or assist[ed] in any felonious criminal conduct by members of [the criminal street] gang" in which he actively participates. (§ 186.22, subd. (a).) In this case, the People sought to establish this element by relying on the attempted murder and assault crime charged in this case. Thus, if the gang participation count was severed from the other counts, the evidence regarding the attack on René would need to be presented at both trials. Clearly, this would defeat the goal of promoting efficiency through joinder.

Moreover, evidence of Coronado's gang participation was relevant to show motive and intent as to the attempted murder and assault counts. (See *Williams I, supra,* 16 Cal.4th at p. 193 [gang evidence is admissible if relevant to prove motive or intent].) Because of the cross-admissibility of evidence of the attack in a trial of the gang participation count and of the cross-admissibility of gang evidence in a trial of the attempted murder and assault counts, the court did not abuse its discretion in denying the motion for severance.

In any event, reviewing the record in light of the evidence actually introduced at trial, the joinder did not deprive Coronado of his constitutional right to a fair trial and due process. To the extent the gang evidence was inflammatory, there is no reason to believe the jury did not follow the court's instructions that each count charged is a separate crime and they "must consider each count separately," especially in light of the fact that the jury acquitted Coronado of the substantive gang count.

In addition to severing the trial of different counts under section 954, a trial court also has discretion under section 1044[27] to bifurcate the trial of a gang enhancement allegation. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.) Bifurcation of the gang enhancement may be warranted if evidence of the predicate offenses offered to establish a pattern of criminal activity is "unduly prejudicial" or other gang evidence is "so extraordinarily prejudicial, and of so little relevance to guilt, that it threatens to sway the jury to convict regardless of the defendant's actual guilt." (*Ibid.*)

Having determined that the trial court did not err in refusing to sever the gang participation count from the other counts, we can easily conclude there was no abuse of discretion in denying the motion to bifurcate the trial of the gang enhancement allegations. If the gang participation count had been severed from the other counts, it would make sense to also bifurcate the trial of the gang allegations from the trial of the attempted murder and assault counts. But the trial court denied the motion to sever the trial of the substantive counts and, as explained above, that ruling was not an abuse of discretion. Therefore, the gang evidence would be presented in the trial of the substantive crimes. Because gang evidence that was admissible to establish the enhancement allegations would already come in to prove the substantive gang

---

**27** Section 1044 allows the court "to control all proceedings during the trial … with a view to the expeditious and effective ascertainment of the truth regarding the matters involved."

participation count, there would be no reason to bifurcate the gang enhancement allegation. We find no abuse of discretion in refusing to bifurcate the trial of the gang enhancements. Furthermore, we find no prejudice to Coronado, especially in light of the fact that the jury acquitted Coronado of all of the gang enhancement allegations.

Because we disagree with Coronado's contention that the trial court erred when it denied his motion to sever and bifurcate, we need not address his additional argument that counsel was ineffective for "fail[ing] to present to the court the enormous amount of prejudicial gang evidence that would be introduced if [the] motion was denied." Coronado has failed to show that he would have achieved a more favorable result had the gang offense been severed and the gang enhancement allegations bifurcated. Thus, Coronado cannot establish prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.)

## VI. *PITCHESS* MOTION

Coronado contends that the trial court erred in denying his motion for discovery of peace officer personnel records pursuant to *Pitchess* and requests that this court conduct an independent in camera review of the records to determine if the trial court improperly limited the scope of discoverable records. Respondent does not object to Coronado's request.

Prior to trial, Coronado filed a *Pitchess* motion. In it, he sought discovery of police personnel records of Sheriff's Department Deputies Marvin Gomez and Andrew Avila regarding any citizen complaints relating to dishonesty. The trial court conducted an in camera review and determined that there were no disclosable materials found in the materials produced.

In *Pitchess, supra,* 11 Cal.3d 531, the California Supreme Court held that a criminal defendant is entitled to discovery of officer personnel records if the information contained in the records is relevant to the defendant's ability to defend against the charge. Later enacted legislation implementing the court's rule permitting discovery (§§ 832.5,

832.7, 832.8; Evid. Code, §§ 1043-1047) balanced the accused's need for disclosure of relevant information against a law enforcement officer's legitimate expectation of privacy in her or her personnel records. The Legislature concluded that a defendant, by written motion, may obtain information contained in a police officer's personnel records if it is material to the facts of the case. (Evid. Code, § 1043, subd. (b)(3).) When presented with such a motion, the court rules whether there is good cause for disclosure to the defendant. (Evid. Code, §§ 1043, 1045.) If the court orders disclosure, the custodian of the officer's records brings to court all the potentially relevant personnel records and, in camera, the court determines whether any of the records are to be disclosed to the defense. "A trial court's ruling on a motion for access to law enforcement personnel records is subject to review for abuse of discretion." (*People v. Hughes* (2002) 27 Cal.4th 287, 330; see also *Haggerty v. Superior Court* (2004) 117 Cal.App.4th 1079, 1086, citing *People v. Samayoa, supra,* 15 Cal.4th at p. 827.)

We have received the sealed documents the trial court reviewed in conducting its *Pitchess* analysis. Having obtained those documents, we note first that the trial court complied with the procedural requirements of a *Pitchess* hearing. There was a court reporter present, and the custodian of records was sworn prior to testifying. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1228, 1229, fn. 4; *People v. White* (2011) 191 Cal.App.4th 1333, 1339-1340.) The custodian of records complied with the requirement to bring all the records and submit them for the court to review and determine which documents were relevant. (*People v. Wycoff* (2008) 164 Cal.App.4th 410, 414-415.)

We also have reviewed the sealed documents and find no reversible error with regard to nondisclosure of those records. (*People v. Hughes, supra,* 27 Cal.4th at p. 330; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

VII.   CUMULATIVE ERROR

In conclusion, Coronado contends that the cumulative impact of all of the above errors deprived him of a fair trial. We have either rejected Coronado's claims of error

and/or found that any errors, assumed or not, were not prejudicial.  Viewed cumulatively, we find that any errors do not warrant reversal of the judgment.  (*People v. Stitely* (2005) 35 Cal.4th 514, 560.)

## DISPOSITION

The judgment in Kern County Superior Court case No. BF129529A (*People v. Joe Coronado, Jr.*) is affirmed.  The judgments in Kern County Superior Court case Nos. BF129529B (*People v. Hilario Torres*) and BF129529C (*People v. Allen Rivas*) are reversed and retrial is barred.

_____

Franson, J.

I CONCUR:


_____

Poochigian, Acting P.J.

61.

**Detjen, J., concurring and dissenting:**

I agree with the majority's reasoning and conclusions regarding all but defendant Joe Coronado's *Batson-Wheeler* claim.[1] With respect to that claim, I agree with the majority's statement of the factual background and law explaining the three-step analysis that must be undertaken, as well as its reasoning and conclusions with respect to steps one and two. I respectfully dissent, however, from the majority's analysis of step three and its conclusion no *Batson-Wheeler* violation occurred. On that issue, the majority concludes that, although the prosecutor's stated reasons for exercising a peremptory challenge against Doris O. were, "in part, unsupported by the record," the record "clearly support[s]" the conclusion the prosecutor was confused and made an isolated mistake or misstatement and nothing in the record indicates the trial court did not make the required effort to evaluate the prosecutor's reasons. (Maj. opn. *ante*, at pp. 36, 40, 45-46.) I disagree. The prosecutor never indicated he was confused or mistaken, and I do not agree that such a characterization can fairly be supported on this record. Additionally, the record does not evidence a sincere and reasoned effort by the trial court to evaluate the prosecutor's explanation.

The prosecutor stated: "[Doris O.] works with children, seventh and eighth graders, in Wasco. I know Wasco to be an area that has Hispanic gang populations, especially at that age group. [¶] She did mention that. *She did mention something about seventh and eighth graders and kids being involved in that — in that type of activity, which is the reason why I struck her.*" (Italics added.) What Doris O. actually said was that, although she had watched over seventh- or eighth-grade children in the past, she currently supervised kindergarten through sixth-grade children. *She was never asked, nor*

---

**1** *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*). *Wheeler* has been overruled in part by *Johnson v. California* (2005) 545 U.S. 162 (*Johnson*).

*did she say anything, about gangs or gang activity, let alone seventh and eighth graders or children being involved in that type of activity.* The prosecutor's stated reasons were unsupported by and — with respect to the reason *he himself stated was why he struck her* — clearly and demonstrably contrary to the record.

As the majority suggests, I do find *People v. Silva* (2001) 25 Cal.4th 345 (*Silva*) dispositive. Here, as in *Silva*, there was no mere isolated mistake or misstatement. The prosecutor did not, for example, simply misremember whether Doris O. currently or previously worked with seventh or eighth graders. Rather, he ascribed to her statements on a subject she never mentioned, involvement in gang activity. That subject was the reason he said he excused her, and was wholly unsupported by the record. "[W]hen illegitimate grounds like race [or gender] are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall *on the plausibility of the reasons he gives*." (*Miller-El v. Dretke* (2005) 545 U.S. 231, 252, italics added.)

The majority says the record "clearly support[s]" its determination the prosecutor confused the answers given by Doris O. with those given by another prospective juror, Primavera B.[2] (Maj. opn. *ante*, at p. 40.) I do not believe the record lends itself to such a conclusion. First, the prosecutor never suggested he confused Doris O. with Primavera B. Second, Primavera B. described herself as having a "really, really negative view" of gangs, and said she would probably be a bit more harsh if defendants had a gang affiliation. She also thought she might need less evidence (presumably to convict) than someone who did not know about gangs' lifestyles and "what they do to initiate children ...." Doris O. said nothing of the sort. Third, if the prosecutor truly was concerned with prospective jurors who might have seen children become involved in the gang lifestyle, it is difficult to see why he originally opposed the defense attempt to excuse Primavera B., yet excused Doris O. at the first opportunity. A finding of

---

**2**     The record does not disclose whether Primavera B. was Hispanic.

2

confusion simply does not adequately account for the extensive differences between the answers given by the two prospective jurors, or account for the prosecutor's actions toward each.

I also find the notion the prosecutor was innocently confused highly questionable for another reason. "[T]he question of purposeful discrimination … involve[s] an examination of *all* relevant circumstances." (*People v. Lenix* (2008) 44 Cal.4th 602, 626; accord, *Miller-El v. Dretke, supra,* 545 U.S. at p. 240.) In the present case, at least two of the prosecutor's first three peremptory challenges were to Hispanic-surnamed individuals, one of whom was a woman. The initial panel of prospective jurors, against whom these three challenges were exercised, was dismissed when one of its members said something that suggested two defendants had been in prison. After a new panel of prospective jurors was called, the prosecutor proceeded to exercise another seven peremptory challenges, of which six were to women, four of whom were Hispanic.[3] At this point, defendants made their *Batson-Wheeler* motion. The record does not reveal the ethnicity or race of those who became trial jurors. It can be ascertained, however, that three male trial jurors had, like Doris O., histories that involved interaction with children of the age Doris O. supervised. One male juror had lived in Bakersfield his entire life and was a substitute teacher whose wife was a teacher's aide; another male juror was born and raised in Kern County and was a retired elementary school teacher who had taught fourth through eighth grades; and a third male juror had lived in Shafter since 1963 and had three children who would all be going to high school the following year. All three of these jurors were examined before the *Batson-Wheeler* motion. During its ruling on the *Batson-Wheeler* motion, the trial court commented that the prosecutor used "almost all of his peremptory challenges … on women." After the motion was denied, the prosecutor made a point of noting "for the record that there are … at least four

---

[3]   It appears the male prospective juror who was excused was also Hispanic.

3

females remaining on the panel, which I have accepted." He then made only two more peremptory challenges. While one was to a Hispanic male, neither was to a woman. The prosecutor did not challenge a woman who worked with high-risk youths, ages 15 through 21, at a career services center. In order to enter the program, the youngsters had to be teen parents, gang members or associates, members of a minority group, or economically disadvantaged. This juror spoke to one particular youngster about the gang lifestyle, although not in detail. The prosecutor did not challenge another woman who was a teacher of students ages 18 to 24 who were going back to school to get a high school diploma. Both women remained as trial jurors.

In my view, the foregoing circumstances add to the justifiable suspicion concerning the prosecutor's stated reasons for challenging Doris O. This record does not support a conclusion of confusion, mistake, or misstatement.

At step three of the *Batson-Wheeler* analysis, the trial court must make "a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case as then known, … for 'we rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination.' [Citation.]" (*People v. Hall* (1983) 35 Cal.3d 161, 167-168; see also *People v. Lomax* (2010) 49 Cal.4th 530, 570-571.) The trial court must assess the plausibility of the prosecutor's given reason(s) "'in light of all evidence with a bearing on it.' [Citation.]" (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1320-1321.) "[T]he trial court must determine not only that a valid reason existed but also that the reason actually prompted the prosecutor's exercise of the particular peremptory challenge." (*People v. Fuentes* (1991) 54 Cal.3d 707, 720.) "When a trial court has made a sincere and reasoned effort to evaluate each of the stated reasons for a challenge to a particular juror, we accord great deference to its ruling, reviewing it under the substantial evidence standard. [Citations.]" (*People v. Jurado* (2006) 38 Cal.4th 72, 104-105; accord, *People v. Lenix, supra,* 44

4

Cal.4th at p. 627; see *Batson*, *supra*, 476 U.S. at p. 98, fn. 21; *Paulino v. Harrison* (9th Cir. 2008) 542 F.3d 692, 699.) This requirement of deference does not, however, mean we abandon or abdicate the required judicial review. (*Miller-El v. Cockrell* (2003) 537 U.S. 322, 340.)

Counsel for defendant Allen Rivas and counsel for defendant Hilario Torres made comments to the trial court during the motion (maj. opn. *ante*, at p. 31) which suggested the prosecutor's stated reasons for his challenge might not have had support in the record. Yet the trial court did nothing to ascertain what Doris O. actually said. Doris O.'s responses were clearly documented and the trial court had readily consulted its notes, or the reporter's transcript of voir dire, with respect to issues arising at other times during jury selection — including, interestingly, a matter that came up with respect to the challenge for cause to Primavera B. Under the circumstances, the trial court was obligated to do more to assess the genuineness of those reasons than merely include them in blanket, unquestioning findings. (See, e.g., *Snyder v. Louisiana* (2008) 552 U.S. 472, 479-485 [implausibility of prosecutor's explanations for excusing African-American prospective juror was shown by circumstances apparent from record and comparison of that individual with Caucasian jurors accepted by prosecutor; prosecutor had described both proffered explanations as "'main concern[s]'" and record did not show he would have exercised challenge based on one stated reason alone]; *Miller-El v. Dretke, supra,* 545 U.S. at pp. 240-245 [numbers describing prosecutor's use of peremptory challenges "remarkable" where prosecutor used such strikes to exclude 91 percent of eligible African-American venire members; in addition, prosecutor mischaracterized African-American prospective juror's answers; although prosecutor may have misunderstood, that possibility was unlikely in view of how prosecutor proceeded and comparison of views of Caucasians prosecutor accepted].) The trial court here failed to undertake the requisite "'sincere and reasoned attempt to evaluate the prosecutor's explanation.'" (*Silva*, *supra*,

25 Cal.4th at p. 385.) Its ruling should not, therefore, be deferred to. (*Id*. at pp. 385-386.)

The majority says the prosecutor's recollection and stated reasons for challenging the other prospective jurors who were the subject of the *Batson-Wheeler* motion "were accurate, after five days of voir dire and an intervening weekend, and non-discriminatory." (Maj. opn. *ante*, at p. 40.) This may be so, but it does not excuse the trial court from probing the reasons stated for the peremptory challenge to Doris O. Because the trial court erred with respect to her, the absence of error concerning the other prospective jurors who were the subject of the *Batson-Wheeler* motion is immaterial: "The exclusion by peremptory challenge of a single juror on the basis of race or ethnicity [or gender] is an error of constitutional magnitude requiring reversal. [Citations.]" (*Silva*, *supra*, 25 Cal.4th at p. 386.)

The majority opinion points out that in *Silva*, nothing in the record supported the prosecutor's stated reasons for the challenged peremptory strike, while here, "one of the prosecutor's reasons was race neutral while the second reason was unsupported by the record." (Maj. opn. *ante*, at p. 41.) In light of the totality of the relevant circumstances shown by the record in this case, this is a distinction without a difference. "The fact that one or more of a prosecutor's justifications do not hold up under judicial scrutiny militates against the sufficiency of a valid reason. [Citation.]" (*McClain v. Prunty* (9th Cir. 2000) 217 F.3d 1209, 1221.)

In *People v. Alvarez* (1996) 14 Cal.4th 155, the California Supreme Court found the fact that one neutral explanation may have been without basis in the record did not undermine the genuineness or sufficiency of the prosecutor's remaining neutral explanations. (*Id*. at p. 198.) In that case, however, the trial court examined the record. (*Id*. at p. 195.) The trial court did not do so here with respect to Doris O., even when defense counsels' comments indicated the prosecutor's stated reason may not be accurate. Had the trial court probed the prosecutor's stated reason for challenging Doris O., it is

6

possible the prosecutor would have said he would have excused her simply because she worked with children around the age that gangs start recruiting. Presumably, the trial court's determination of credibility would then have been entitled to our deference. But because the prosecutor ascribed to Doris O. statements she never made concerning the core reason he gave for her excusal, the prosecutor's entire explanation is thrown into question when considered in light of all the circumstances bearing on the point.

I find the cases on which the majority relies to be readily distinguishable.

In *People v. Williams* (1997) 16 Cal.4th 153, the prosecutor expressly stated he excused a particular prospective juror "'in error.'" (*Id*. at p. 188.) In the present case, the prosecutor was never called upon to state whether he made a mistake, let alone to explain the genesis of the purported error.

In *People v. Phillips* (2007) 147 Cal.App.4th 810, the prosecutor stated, in response to the defendant's *Batson-Wheeler* motion, that she excused one prospective juror because he was a teacher at a religious school and it had been the prosecutor's experience such jurors had trouble finding people guilty. The trial court accepted the explanation. Later, however, the prosecutor realized she had accidentally relied on information in the questionnaire of another juror with the same last name, and she informed the court of her mistake. (*Phillips, supra,* at p. 814.) Here, as already noted, the prosecutor never admitted making a mistake. If the prosecutor had truly confused Doris O. with Primavera B., defense counsel's statements should have caused him at least to wonder if he had made an error. Thus, we are not presented with a situation in which an error is admitted by the prosecutor and the trial court is called upon to assess whether the mistake was genuine.

In *People v. Jones* (2011) 51 Cal.4th 346 (*Jones*), African-American prospective juror N.C. revealed on his juror questionnaire that his son had been accused of a crime. In response to a defense *Batson-Wheeler* motion, the prosecutor explained this concerned him, especially when he saw N.C.'s reaction when defense counsel talked about being

7

falsely accused.  The prosecutor mentioned that he thought N.C.'s son had been accused of attempted murder or murder.  In reality, N.C. stated on the questionnaire only that his son had been accused of a crime and that the case had gone to trial.  (*Jones, supra,* at pp. 357-358.)  The state Supreme Court rejected the defendant's claim that, under *Silva,* deference should not be accorded the trial court's ruling because, after hearing from the prosecutor, it denied the motion without further discussion.  (*Jones*, *supra*, 51 Cal.4th at p. 361.)  The high court found the statistical evidence "not particularly troubling," as the prosecutor peremptorily challenged African-Americans "at a rate only slightly higher than their percentage on the jury." (*Id*. at p. 362.)  With respect to the prosecutor's misstatement concerning the crime of which N.C.'s son was accused, the Supreme Court acknowledged the error, but stated:

> "Although relevant, this circumstance is not dispositive.  No reason appears to assume the prosecutor intentionally misstated the matter.  He might have based what he thought on information he obtained outside the record.  Or he may simply have misremembered the record.  The prosecutor had to keep track of dozens of prospective jurors, thousands of pages of jury questionnaires, and several days of jury voir dire, and then he had to make his challenges in the heat of trial.  He did not have the luxury of being able to doublecheck all the facts that appellate attorneys and reviewing courts have.  Under the circumstances, it is quite plausible that he simply made an honest mistake of fact.  Such a mistake would not show racial bias, especially given that an accurate statement (that N.C. wrote that his son had been accused of, and tried for, a crime but left the rest of the answer blank) would also have provided a race-neutral reason for the challenge." (*Id*. at p. 366.)

In *Jones*, the core reason stated by the prosecutor as indicating possible bias on N.C.'s part was that N.C.'s son had been accused of a crime.  That reason was inherently plausible and supported by the record, *and would have been no matter what the actual charge(s) against the son*.  Thus, *Jones* fits squarely within the California Supreme Court's longstanding rejection of an isolated mistake or misstatement as being enough to compel the conclusion a reason was not sincere.

8

In the present case, by contrast, the core reason stated by the prosecutor as indicating possible bias on Doris O.'s part was her mentioning something about kids being involved in gang-type activity.  In fact, as I have previously emphasized and we cannot ignore, *Doris O. said absolutely nothing about gangs*, and indeed was not even questioned about them aside from the confidential questionnaire.**4**  Even if we assume the prosecutor could rely on his own professed knowledge of Hispanic gang activity in Wasco, it would be sheer speculation for us to assume Wasco is so riddled with Hispanic gang activity that Doris O. likely had contact with it during her past work supervising seventh or eighth graders.  Under these circumstances, the prosecutor's stated reasons — the only reasons we can look to at the third step of a *Batson-Wheeler* analysis (*Jones*, *supra*, 51 Cal.4th at p. 365) — are neither inherently plausible nor supported by the record.  "If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false." (*Miller-El v. Dretke, supra,* 545 U.S. at p. 252.)

*Jamerson v. Runnels* (9th Cir. 2013) 713 F.3d 1218 [2013 U.S. App. LEXIS 8310], while persuasive rather than binding authority (*People v. Santamaria* (1994) 8 Cal.4th 903, 923), illustrates my point with respect to *Jones*, and also summarizes what my research shows to be the current state of United States Supreme Court thinking on the issue.  In the course of its main discussion, the *Jamerson* court noted that the magistrate's finding of discriminatory intent rested on additional grounds that were insufficient to raise an inference of discriminatory motive.  The Court of Appeals explained:

> "[T]he magistrate judge faulted the prosecutor for 'incorrectly stat[ing] that [Juror #0970] has "brothers" serving time in prison, when she actually had said that "a brother" had been in prison.'

---

**4**      As for Doris O.'s answers in the confidential questionnaire, there was nothing that would have supported the prosecutor's stated reasons for excusing her.  (Maj. opn. *ante*, at p. 36, fn. 23.)

"According to the Supreme Court in *Miller-El* [*v. Dretke*], the mischaracterization of a potential juror's testimony weighs against a prosecutor's credibility. [(*Miller-El v. Dretke, supra,* 545 U.S. at pp. 243-244.)] But as the Supreme Court clarified in *Rice* [*v. Collins* (2006) 546 U.S. 333], 'seizing on what can plausibly be viewed as an innocent transposition makes little headway toward the conclusion that the prosecutor's explanation was clearly not credible.' [(*Rice v. Collins, supra,* 546 U.S. at p. 340.)]

"In these two cases, the Supreme Court has thus drawn a fine distinction between a prosecutor's false statement that creates a new basis for a strike that otherwise would not exist and a prosecutor's inaccurate statement that does nothing to change the basis for the strike. [(Compare *Miller-El v. Dretke, supra,* 545 U.S. at pp. 243-244 [claiming that a juror indicated he would not vote for the death penalty when the juror clearly specified that he would vote for it], with *Rice* [*v. Collins*], *supra*, 546 U.S. at p. 340 [miscounting the number of jurors who were dismissed based on their youth but correctly reporting that the challenged juror was youthful].)] In this case, the prosecutor's mistaken belief that Juror #0970 had 'brothers serving time' rather than a brother who served time falls on the *Rice* side of the line. Whether or not the juror had one brother or two brothers incarcerated, the same justification for the strike remained — the juror might have an unfavorable view of the system based upon a family member's involvement in it. Thus, the prosecutor's misspeak offers no proof of discriminatory intent. [(See *Rice v. Collins, supra,* 546 U.S. at p. 340.)]" (*Jamerson v. Runnels, supra,* 713 F.3d at p. 1232, fn. 7 [2013 U.S. App. LEXIS at pp. *34-*36, fn. 7].)

The prosecutor's false statement that Doris O. mentioned children being involved in gang activity created a basis for a peremptory challenge that otherwise would not have existed. It is thus manifestly distinguishable from his misstatement that she currently worked with seventh or eighth graders, which made no difference with respect to the basis for the strike.

The majority also relies on *People v. Williams* (2013) 56 Cal.4th 630 (*Williams*). In that case, defense counsel brought three separate *Batson-Wheeler* motions in response to the prosecutor's peremptory challenges against five African-American women prospective jurors. (*Williams*, *supra*, at p. 649.) The third motion concerned the prosecutor's excusal of R.J., which the prosecutor explained was because of his

10

impression, which he formed from her answers, demeanor, and the manner in which she answered, that she would not be able to impose the death penalty in any case. The trial court, which did not recall R.J.'s responses and had stopped taking notes by the time she was questioned, accepted the prosecutor's explanation and denied the *Batson-Wheeler* motion. (*Williams*, *supra*, at pp. 651-652.) The final composition of the jury was seven Caucasians and five African-Americans, of whom four were male and one was female. (*Id*. at p. 652.)

On appeal, the defendant, relying primarily on *Silva*, contended the trial court failed adequately to probe the prosecutor's explanations about the demeanors of the prospective jurors, especially those as to whom the trial court did not take notes and had no independent recollection. (*Williams*, *supra*, 56 Cal.4th at pp. 652-653.) Since the prosecutor's stated race-neutral reason for the strikes — reluctance to impose the death penalty — was not inherently implausible, the Supreme Court examined the record to determine whether it supported the stated reason. (*Id*. at p. 653.) The court found such support in R.J.'s written questionnaire and in her statements on voir dire. It further noted the prosecutor accepted three panels with R.J. on them, a fact that was raised during the discussion of the *Batson-Wheeler* motion in the trial court and that, while not conclusive, could indicate the prosecutor's good faith and was an appropriate factor for the trial judge to consider. (*Williams*, *supra*, 56 Cal.4th at pp. 658-659.)

While concluding the record supported the prosecutor's stated race-neutral reason for challenging R.J., the high court majority observed the record also presented the possibility the prosecutor mistook R.J. for another prospective juror, D.J., who was also an African-American woman and who had the same last name. (*Williams*, *supra*, 56 Cal.4th at p. 659.) The court based this on the record of defense counsel's new trial motion, which included a claim of *Batson-Wheeler* error. In the hearing on the motion, the prosecutor provided a chronological narrative of his 16 peremptory challenges. He listed his 14th challenge as being to D.J., whom he described as a married, 39-year-old

African-American female. D.J.'s juror questionnaire confirmed the accuracy of this description. The prosecutor made no mention of R.J., whose questionnaire stated she was "'remarried'" and 65 years old. This apparent discrepancy was not mentioned by defense counsel or the trial court. (*Williams*, *supra*, at pp. 659-660.)

The Supreme Court determined the record supported the prosecutor's representations regarding D.J. and her reluctance to impose the death penalty. (*Williams*, *supra*, 56 Cal.4th at pp. 660-661.) It acknowledged the trial court and parties were never made aware of the prosecutor's possible error in excusing R.J. instead of D.J., but concluded: "This … does not in itself affect the determination whether the prosecutor's excusal was based on a race-neutral reason. The information disclosed at the new trial motion hearing strongly supports the race-neutral reason the prosecutor gave at the time of the motion — hesitancy to impose the death penalty. Therefore, assuming that the prosecutor mistakenly excused R.J. because he thought she was D.J., there was no violation of *Batson/Wheeler*." (*Id.* at p. 661.)

In *Williams*, the record clearly suggested, and supported a fairly compelling inference, that a genuine mistake occurred. Moreover, the prosecutor's stated race-neutral reason for the strikes was supported by the record with respect to *both* R.J. and D.J. Here, by contrast, there is simply no reasonable possibility the prosecutor genuinely would have been concerned that someone giving Primavera B.'s answers, and making the statements she did, might be biased against his position or have some subconscious sympathy toward defendants. If the prosecutor truly was concerned in that regard, he would not have presented such vehement initial opposition to defendants' challenge to Primavera B. for cause.

In ruling on the defense motion in the present case, the trial court observed that the prosecutor had passed the panel on five occasions. I do not believe this demonstrates nondiscriminatory intent under the circumstances, since the prosecutor never passed the panel with Doris O. in the box. (See *People v. Motton* (1985) 39 Cal.3d 596, 607-608.)

12

Indeed, he struck her as soon as she was placed in a position to be on the jury as finally constituted.  In *Williams*, by contrast, the prosecutor accepted three panels with R.J. on them.  (*Williams*, *supra*, 56 Cal.4th at pp. 658-659.)

Nor am I persuaded by the fact that, at the time the *Batson-Wheeler* motion was made, there were apparently four Hispanics and four females on the panel, and the defense had struck two Hispanic females with joint challenges.  (See *People v. Ward* (2005) 36 Cal.4th 186, 203.)  The record does not show whether any Hispanic females were on the panel at the time of the motion, or the composition of the jury as finally constituted.  A *Batson-Wheeler* violation "does not require 'systematic' discrimination [citation] and is not negated simply because both sides have dismissed minority jurors or because the final jury is 'representative.'"  (*People v. Arias* (1996) 13 Cal.4th 92, 136-137.)

When the core reason given by a prosecutor for a challenged excusal lacks support in the record, and the record reveals reasons beyond the misstatement (e.g., statistics, a comparison of prospective jurors excused with trial jurors) that call into question the genuineness of the prosecutor's stated reason(s), it suggests the prosecutor's explanation is pretextual.  "The prosecution's proffer of [a] pretextual explanation naturally gives rise to an inference of discriminatory intent.  [Citations.]"  (*Snyder v. Louisiana, supra,* 552 U.S. at p. 485.)  "When there is reason to believe that there is a racial [or gender-based] motivation for the challenge, neither the trial courts nor we are bound to accept at face value a list of neutral reasons that are either unsupported in the record or refuted by it.  Any other approach leaves *Batson* a dead letter."  (*Johnson v. Vasquez* (9th Cir. 1993) 3 F.3d 1327, 1331.)

We cannot know whether the prosecutor's stated reasons for excusing Doris O. were truly pretextual or the result of honest mistakes, because they are unsupported by and contrary to the record, other circumstances call their genuineness into question, and the trial court neglected its resultant duty to make "'a sincere and reasoned attempt to

13

evaluate the prosecutor's explanation.'" (*Silva*, *supra*, 25 Cal.4th at p. 385.)  This being the case, the trial court's decision to accept the prosecutor's reasons and deny the defense motion are not entitled to deference on appeal (*People v. Lenix, supra,* 44 Cal.4th at p. 614; *Silva*, *supra*, at pp. 385-386), and the omission leaves the inferences of pretext and discriminatory intent unrebutted (see *Snyder v. Louisiana, supra,* 552 U.S. at p. 485).

Nobody wants to see time and scarce judicial resources spent on a retrial of someone who caused physical and emotional trauma to others, and who was convicted on compelling evidence after an otherwise fair trial.  Our duty, however, is to the law.  We must not lose sight of the fact that a defendant in a criminal case has "the right to be tried by a jury whose members are selected pursuant to non-discriminatory criteria" (*Batson*, *supra*, 476 U.S. at pp. 85-86); moreover, "discrimination in selection of jurors harms not only the accused whose life or liberty they are summoned to try," but "[t]he harm … extends beyond that inflicted on the defendant and the excluded juror to touch the entire community." (*Id*. at p. 87.)

Because substantial evidence does not support the trial court's finding as to Doris O., its ultimate determination, that Coronado failed to meet his burden of proving intentional discrimination with respect to that prospective juror, cannot constitutionally stand.  (See *Silva*, *supra*, 25 Cal.4th at pp. 385-386.)  "When a trial court does 'not satisfy its *Batson/Wheeler* obligations, … the conviction … must be reversed.'" (*People v. Long* (2010) 189 Cal.App.4th 826, 843.)

_____

DETJEN, J.

14